[Cite as *State v. Reynolds*, 2017-Ohio-1478.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                             Court of Appeals No. L-16-1021

    Appellee                                         Trial Court No. CR0201401779

v.

Lecorius Reynolds                                  **DECISION AND JUDGMENT**

    Appellant                                        Decided:  April 21, 2017

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, Frank H. Spryszak
and Evy M. Jarrett, Assistant Prosecuting Attorneys, for appellee.

Karin L. Coble, for appellant.

* * * * *

**MAYLE, J.**

### Introduction

{¶ 1} This case involves the killing of Roy Roberts by the defendant-appellant,

Lecorius Reynolds.  Reynolds stabbed the victim with a knife, killing him, and then

moved the body to the railroad tracks.  Within 24 hours, the Toledo Police Department

had Reynolds in custody. During the police interview, Reynolds confessed that he "poked [the victim's] neck out" and then moved the body to the railroad tracks. The police arrested Reynolds and charged him with murder.

{¶ 2} During a bench trial before the Lucas County Court of Common Pleas, Reynolds argued that he was not guilty of the offense by reason of insanity. Reynolds suffers from long-standing schizophrenia. The trial court rejected Reynolds' affirmative defense and found him guilty of felony murder.

{¶ 3} On appeal, Reynolds claims that the verdict was against the manifest weight of the evidence because he proved he was criminally insane at the time of the offense. Reynolds also alleges that he received ineffective assistance of trial counsel based upon his attorney's failure to move to suppress the police video of his interrogation. Reynolds argues that he was incapable of providing a voluntary confession, given his mental disease.

{¶ 4} For the reasons that follow, we find that the guilty verdict is not against the manifest weight of the evidence and that Reynolds did not receive ineffective assistance of counsel as a matter of law. Accordingly, we affirm his conviction.

**Facts and Procedural History**

{¶ 5} The facts of this case are not in dispute. On May 2, 2014, around 9:00 p.m., Officer Russell of the Toledo Police Department received a report that a pedestrian had been struck by a train, near Airline Road, in Toledo, Ohio. Officer Russell reported to

2.

the scene, where he found the severed body of a man under a rail car, on the tracks.  The body was naked.

{¶ 6} Sergeant Roy Kennedy was also there.  He noted the absence of blood at the scene.  Kennedy testified that "if [the victim] had been alive when he was struck by the train, * * * there would have been a large amount of blood at the scene, and there wasn't."

{¶ 7} In an effort to learn the identity of the victim, Officer Russell and his partner walked door-to-door in the neighborhood adjacent to the railroad tracks.  Their first stop was about a block and one-half away, at a "group home" for men, located at 129 Dale Street.  Russell was familiar with the home, as he had been called there a few weeks earlier, in response to a call that two men were sword fighting in the front yard.

{¶ 8} A resident answered the door and allowed the officers to come inside.  Russell testified that there was blood throughout the house including a "large chunk of coagulated blood" on the living room carpet and more blood on the couch, on the steps going upstairs, and on the upstairs leading to a bedroom.  The bedroom had "a very large pile of gelled coagulated blood under the bed."  The officers radioed the police department to report a possible crime.  They found Reynolds in his bedroom, lying on his bed, and watching television.  Officer Russell and Sergeant Kennedy described Reynolds as "very calm."

3.

**{¶ 9}** After they made sure that there were no other victims inside, the police suspended their search of the home until a search warrant was obtained. Officer Russell transported Reynolds and the other two residents to the police department.

**{¶ 10}** Reynolds' interview with Toledo Police Detectives Deborah Hahn and Quinn began at about 5:19 a.m. on May 2, 2014. They provided Reynolds with his *Miranda* rights, which he acknowledged in writing. The interview was recorded and was entered as an exhibit.

**{¶ 11}** Detective Hahn described Reynolds, and the video demonstrates, that his demeanor was "very calm" and "cooperative." Hahn testified that Reynolds was responsive to questions, orientated to time and place, gave appropriate responses, and did not appear to be intoxicated. Hahn observed that Reynolds had an injured, bloody right eye, a scratch on his upper body, and blood under his fingernails.

**{¶ 12}** The taped interview lasted approximately three hours, although a large block of that time consisted of the forensic team taking skin, fingernail, and buccal swab samples of Reynolds. There were also two extended periods of time, during which no one was in the room, except Reynolds.

**{¶ 13}** In the beginning of the interview, Reynolds claimed he had not seen the victim for several weeks, since before Reynolds went to jail on an unrelated matter. In fact, Reynolds had just been released from jail on May 1, 2014, one day before the offense, after serving 17 days at the Corrections Center of Northwest Ohio for fighting.

4.

**{¶ 14}** When asked about his eye injury, Reynolds said that he had injured it while in jail. He explained that he had gotten blood on his hands while cleaning up the bathroom. He said that it was his housemate Shannon's blood, and that it was common for Shannon to bleed.

**{¶ 15}** Steadily over the course of the interview, however, Reynolds admitted that he had hurt the victim.

**{¶ 16}** It began with his admission that he "found" the victim in a large recycling bin and that the victim "did not look good." Ultimately, he told the following story: that during the early morning hours of May 2, 2014, the victim had come into Reynolds' room naked. Reynolds said that the victim did that on occasion and Reynolds did not like it. He claimed that the victim had touched his buttocks. Reynolds responded by "pok[ing] his neck out with my hands." He also said that he "karate chopped" the victim about 20 times in the neck.

**{¶ 17}** Reynolds claimed that he acted in self-defense because he feared being sexually assaulted by the victim. Reynolds can be heard in the video saying, "I don't want to be gay." Written on Reynolds' bedroom wall was "Roy GBIV Ambassador American money toy 10,000 E." No definitive evidence was offered to explain what was meant by that writing. On the one hand, the victim's first name was "Roy." Also, Detective Kristie Eycke, who gathered evidence in this case, testified that "roygbiv" is a common acronym for the colors of the rainbow, i.e. red, orange, yellow, green, blue, indigo and violet. Eycke also testified that the rainbow is a symbol for gay rights.

5.

{¶ 18} After the assault, Reynolds pushed the victim's body out of his bedroom and into the victim's room, leaving a blood trail. The largest concentration of blood was found underneath the victim's bed. Reynolds said that he hid the victim's coat in a pile of clothes, wiped down the floor with his own bedsheet, and then hid the bedsheet in between his own mattress and box spring. He hid the victim's body under some clothes, and kept him there all day. After dark, he brought the large recycle bin inside, put the victim's body in it, took him downstairs, outside, and wheeled him to the railroad tracks. He admitted that he placed the victim's body over the railroad tracks.

{¶ 19} Reynolds estimated that he had fought with the victim between 4:00 and 5:00 a.m. on May 2, 2017, roughly 24 hours before his police interrogation. Reynolds also estimated that he last received an injection to treat his schizophrenia in January of 2014, although he may have taken someone else's prescribed psychotropic medication that day.

{¶ 20} After admitting what he had done, Reynolds was left alone in the interview room for several minutes. During that time, Reynolds appeared to say to himself, "Why did you open your mouth like that?"

{¶ 21} Cynthia Beisser, M.D., a deputy coroner with the Lucas County Coroner's Office, testified that the victim died as a result of a stab wound to the right side of his neck. She opined that an incision on the victim's finger appeared to be defensive in nature.

6.

{¶ 22} Detective Eycke gathered evidence and took pictures at the railroad tracks and Reynolds' home. Eycke observed evidence of an "attempt to clean the blood off the wall in the victim's bedroom." She also testified that the sheet that was between Reynolds' mattress and box spring appeared to have been hidden there.

{¶ 23} Based upon information learned during the autopsy and from Reynolds' interview, Detective Eycke returned to the house a second time, with a second warrant. Investigator Hahn instructed the detective to look for a bloody coat and the murder weapon. This time, she found the black hooded coat that Reynolds referenced during his interview. It was covered in blood in the victim's closet, "buried" under other clothes. She also went looking for a knife, which she found in a kitchen strainer. Neither the blade nor the handle was blood-stained, but trace amounts of blood were found where the blade met the handle. Eycke also secured and photographed the inside of the recycle bin, which had blood at the bottom.

{¶ 24} Test results from the Bureau of Crime Investigations showed that the blood on the knife belonged to the victim. Also, a forearm swab of blood taken from Reynolds contained the victim's DNA.

{¶ 25} Following the interrogation, Reynolds was arrested. The Lucas County Grand Jury indicted Reynolds on two counts of murder: aggravated murder in violation of R.C. 2903.02(A) and 2929.02 and felony murder in violation of R.C. 2903.02(B) and 2929.02.

7.

{¶ 26} Over the course of the next several months, Reynolds' mental health deteriorated, and he was taken to Twin Valley Behavioral Healthcare, a state institution located in Columbus, Ohio. On August 6, 2014, the trial court found Reynolds not competent to stand trial, based upon his treatment records at Twin Valley. The court also ordered that Reynolds be placed on forced medications. Six months later, on March 18, 2015, the court found that Reynolds was competent, based upon the opinion of Aracelis Rivera, Psy.D.

{¶ 27} Reynolds entered pleas of not guilty and not guilty by reason of insanity. A bench trial took place over four days, beginning on December 7, 2015.

{¶ 28} During the course of the trial, the state called the five state officials previously identified. The defense called John Fabian, Psy.D., J.D., who opined that Reynolds was not guilty by reason of insanity.

{¶ 29} In rebuttal, the state put forth its own expert, Dr. Rivera. Both experts are highly qualified, with years of experience in evaluating criminal defendants for the purpose of a not guilty by reason of insanity ("NGRI") defense.

**The Medical Experts**

{¶ 30} The experts agree that, at the time of the offense, Reynolds was suffering from a severe mental disease. They also agree with the diagnosis of "schizoaffective disorder" which includes the primary diagnosis of schizophrenia but also includes, in Reynolds' case, bipolar disorder. In Dr. Fabian's words,

8.

He has manic states, and these states are acute where an individual has racing thoughts, racing speech, disorganized speech, lots of activity, hypertalk, hyperactivity, irritability, and often one is manic with schizoaffective disorder, they would be psychotic at the time of those manic states. So, not only are they high with energy and disorganized and thinking and talking a mile a minute, acting fast, pressured thoughts, speech and behaviors, but also having, again, the hallucinations and delusions where they are activity psychotic.

{¶ 31} While there is no dispute that Reynolds suffered from schizoaffective disorder at the time of the offense, the experts differ as to whether Reynolds understood the wrongfulness of his act, that is, whether Reynolds was not guilty by reason of insanity. Their respective opinions are discussed in greater detail below.

### Dr. Fabian's Opinion

{¶ 32} The defense expert, Dr. Fabian, evaluated Reynolds 13 months after the offense.

{¶ 33} Dr. Fabian noted that Reynolds has suffered from a mental disease since at least 2001, at the age of 21, when he was discharged from the United States Navy because of his mental illness. He began receiving Social Security Disability benefits based upon his mental illness at that time.

{¶ 34} Dr. Fabian found significant a letter written by Reynolds from the county jail in the days prior to the offense. The letter is non-sensical and directs others to kill

sons of former world leaders. Dr. Fabian opined that the letter reflects "delusional thinking and cognitive disorganization and evidence of mental illness" just days prior to the offense. After his arrest, Reynolds authored three more letters to the trial court, all of them entered as exhibits, that indicate Reynolds' delusional thinking continued.

{¶ 35} During the evaluation, Reynolds told Dr. Fabian that, at the time of the offense, a witch told him to "whup his ass." As he stabbed the victim, the voices encouraged him, saying "yeah, yeah." Those voices also told him to bring the victim's body back to his own room and to dispose of him on the railroad tracks. Reynolds believed that the victim could possibly rape him and/or hurt his family.

{¶ 36} In his 24-page report and while testifying, Dr. Fabian identified many "goal directed behaviors" that suggest Reynolds "knew the wrongfulness of his acts." Those actions cited by Dr. Fabian include: moving the body, hiding the body, covering the body, rinsing off the knife, washing his hands, changing his clothes, and hiding the body on the tracks.

{¶ 37} On the other hand, Dr. Fabian also noted that Reynolds reported that "many of these [same actions] were in part due to hearing voices * * * which would be due to psychotic symptoms."

{¶ 38} Dr. Fabian concluded that "this is a close call case" and that the ultimate issue should be resolved "by the trier of fact." For his part, he opined that "there was at least some partial evidence that [Reynolds] did not know the wrongfulness of his acts."

10.

**Dr. Rivera's Opinion**

{¶ 39} The state's expert, Dr. Rivera, testified that Reynolds' conduct after killing the victim was indicative of "goal-directed behavior and that perhaps [he] was trying to get rid of possible incriminating evidence in the case." She explained that individuals who are unaware of the wrongfulness of their conduct,

> do not go to the length of getting a knife, washing a knife, moving a body, covering a body, putting them in the trash can, dragging them and disposing of the body, because they don't know that they have done anything wrong. So, why engage in that behavior? Someone who is psychotic and disorganized is likely to just leave the knife where they found it, leave the body where it was, and perhaps not even change clothing because they are oblivious of what they have done. There is no need for them to conceal what they have done because they don't know that they did anything wrong. They are disorganized, the behavior is random, it is not linear, it is not goal-oriented.

{¶ 40} Unlike Dr. Fabian, Dr. Rivera detected no psychotic motive when she evaluated Reynolds. That is, Reynolds did not tell Dr. Rivera that he had heard voices commanding him to harm the victim, as he had told Dr. Fabian. Dr. Rivera denied that this alleged psychotic motive, as reported by Dr. Fabian, should cause her to change her opinion. As she explained,

11.

[Reynolds] did not provide a psychotic motive to me when I interviewed him. But most significantly, he neither provided a psychotic motive during the police interrogation that took place within hours of the index offense. What was significant is that he changed the story.

{¶ 41} Finally, Dr. Rivera denied that Reynolds could have been "floridly psychotic"—i.e. in the throes of full-blown psychosis—at the time of the offense but nonetheless appear "calm, cooperative [and] polite" and "be able to answer questions, follow directions" during the police interview only 24 hours later. She testified, "Someone who is totally out of control because of [his] psychosis is not going to be able to conform their behavior [24 hours later] in particular during such a stressful process * * *."

{¶ 42} Dr. Rivera concluded that Reynolds understood the wrongfulness of his conduct at the time he killed the victim.

### The Verdict and Sentence

{¶ 43} Following the bench trial, the trial court rejected Reynolds' insanity and self-defense arguments.

{¶ 44} The court found Reynolds guilty of Count 2, that Reynolds had proximately caused the victim's death in the commission of a felony offense of violence (felonious assault). The court made no finding with regard to the allied murder charge set forth in Count 1. It sentenced him to fifteen years to life in prison, to be served in a prison psychiatric unit.

12.

**{¶ 45}** The court appointed appellate counsel, who filed an appeal on Reynolds' behalf.  Reynolds asserts two assignments of error.

### Assignments of Error

1.  Reynolds' conviction is against the manifest weight of the evidence because he proved the insanity defense by a preponderance of the evidence.

2.  Trial counsel was ineffective for failing to move to suppress Reynolds' statements in the interrogation on grounds of involuntariness due to mental illness.

### Manifest Weight of the Evidence Assignment of Error

**{¶ 46}** In the first assignment of error, Reynolds argues that the conviction is against the manifest weight of the evidence because the evidence demonstrated that he is not guilty by reason of insanity.

**{¶ 47}** In determining whether a verdict is against the manifest weight of the evidence, we sit as a "thirteenth juror."  *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).  We review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses.  *Id*.  Additionally, we determine "whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."  *Id*.  We reverse a conviction on manifest weight grounds for only the most "exceptional case in which the evidence weighs heavily against the conviction."

13.

*Thompkins* at 387. "'[I]t is inappropriate for a reviewing court to interfere with factual findings of the trier of fact * * * unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible.'" *State v. Miller,* 6th Dist. Lucas No. L-08-1056, 2009-Ohio-2293, ¶ 21, quoting *State v. Brown*, 10th Dist. No. 02AP-11, 2002-Ohio-5345, ¶ 10.

{¶ 48} Insanity is an affirmative defense that must be proven by a preponderance of the evidence. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 35; R.C. 2901.05(A). The defendant must persuade the trier of fact that, at the time he committed the offense, he did not know the wrongfulness of his acts due to a severe mental disease or defect. R.C. 2901.01(A)(14). When from the evidence reasonable minds may reach different conclusions upon the question of insanity, such question is one of fact for the trier of fact. *State v. Brown,* 6th Dist. Sandusky No. S-11-031, 2013-Ohio-839, ¶ 13-14.

{¶ 49} In support of the first assignment of error, Reynolds, through his counsel, argues emphatically that "[a] psychotic motive is present." Counsel argues,

> Reynolds consistently showed a paranoid, delusional belief that there was a conspiracy of homosexuals. Reynolds had a paranoid, delusional belief that [the victim] attempted to sexually assault him when [the victim] walked around naked and squeezed his butt. Reynolds psychotically believed that it was necessary to defend himself and that it was not wrong to do so.

14.

{¶ 50} In further support, counsel cites the state's expert, arguing "Dr. Rivera agreed that if [the victim] did *not* try to rape Reynolds, then Reynolds' 'motive was delusional' and indicative of insanity." (Emphasis added.) On this point, the experts agree, although Dr. Fabian stated it differently. He said, "[i]f [Reynolds ] did in fact respond in a self-defensive manner and kill the victim due to threats of rape, there may be some rational motive in the case." These are two sides of the same coin, meaning that if the victim did, in fact, threaten Reynolds, then Reynolds' response was rational, not psychotic.

{¶ 51} The record supports the conclusion that Reynolds attacked the victim because he felt threatened. According to him, the victim walked into his room, naked, in the middle of the night, and touched his buttocks. Reynolds then "karate chopped" the victim 20 times in the neck and dragged the victim's body to his room. The blood trail from Reynold's room to the victim's room, and the fact that the victim's body was naked when found by police, both support Reynolds' story. Thus, if the threat was real, the experts agree that Reynolds, when he attacked the victim, may have been acting out of a fear that the victim was going to assault him, rather than in response to some "paranoid homosexual conspiracy." We find that the evidence supports the trial court's conclusion that Reynolds acted without a psychotic motive.

{¶ 52} Next, Reynolds points to references he made during his interrogation, where he stated that he was a "premier" and "an ambassador." Indeed, thirty minutes into the interview, Reynolds announced to Detective Hahn that he was "an Italian

15.

premier." He also twice described himself as an "ambassador." Reynolds argues that these statements indicate that he was criminally insane at the time of the offense.

{¶ 53} The experts, and the trial court, noted that Reynolds displayed some delusional thinking before, during and after the interrogation. In considering all of the evidence, however, the trial court concluded—and this court agrees—that while Reynolds may have exhibited some signs of delusional thinking, it was outweighed by other, clear evidence of lucidity, appropriateness and an understanding of wrongfulness. In the trial court's own words,

> The Court also notes that the defendant provided no psychotic motives during the interview with police and did not provide any psychotic motives to Dr. Rivera. Why is that important? Dr. Rivera observed what this Court observed. I watched that tape, and I watched it while it was played in court and subsequent to. * * * [T]he interview at the police department * * * was in close proximity to the time of death. * * * This Court did not observe throughout the entire two plus hours of the video interview of [Reynolds ] anything that would suggest that he was suffering at least from a mental disease or defect at the time, or even when [Reynolds] began to articulate what he had done * * *. There was nothing about his articulation of those events that this Court could convincingly and compellingly hang its hat on with respect to whether or not he knew the wrongfulness of his acts at the time of the assault on the victim.

There were a number of things throughout that video interview of [Reynolds] this Court observed, many of which have already been articulated in open court. Oriented to time and place, responsive to questions, with the exception to, and this Court concedes, at the beginning of the conversation there was a very brief, very faint, very slight reference to something about a premier and something about an ambassador. Everything else - - there was no other time, no other comments that the Court observed that would have been strange, for lack of a better word, or inconsistent with a person who was operating of their own free will and fully understanding the wrongfulness of their acts. There was no reference to witches or voices during this interview, nothing.

{¶ 54} Finally, like Dr. Rivera and the trial court, this court also finds significant that Reynolds took steps after the offense to avoid detection, by washing the knife, hiding clothes, concealing the body, and cleaning up blood. Reynolds' "goal oriented" behavior indicates that he appreciated right from wrong. Indeed, efforts by a defendant to conceal his crime indicate an understanding of wrongfulness. *State v. Myers,* 10th Dist. Franklin No. 09AP-926, 2010-Ohio-4602, ¶ 17, citing *State v. Saleh*, 10th Dist. No. 07AP-431, 2009-Ohio-1542, ¶ 86 (Engaging in furtive conduct is reflective of a consciousness of guilt.).

{¶ 55} In sum, we return to the opinion of Reynolds' expert, Dr. Fabian, who concluded that this was a "close call case" and that the issue of Reynolds' sanity should

be left to the "trier of fact." The trial court, acting as the finder of fact, chose to rely more heavily upon the testimony and expert opinion of Dr. Rivera and concluded that Reynolds was capable of distinguishing right from wrong at the time of the offense. *State v. Thomas*, 70 Ohio St.2d 79, 434 N.E.2d 1356 (1982) ("[T]he weight to be given the evidence and the credibility of the witnesses concerning the establishment of the defense of insanity in a criminal proceeding are primarily for the trier of the facts."). And, as discussed, there is ample circumstantial evidence in the record to support this conclusion.

{¶ 56} Having carefully reviewed the record, we conclude that substantial evidence supports the verdict and that the trial court did not lose its way and create a manifest miscarriage of justice. We find that the verdict is not against the manifest weight of the evidence. Reynolds' first assignment of error is not well-taken.

**Ineffective Assistance of Trial Counsel Assignment of Error**

{¶ 57} The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." *Strickland v. Washington*, 466 U.S. 668, 684, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prove a claim of ineffective assistance of counsel, a defendant must show that: (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs one and two of the syllabus, citing *Strickland* at 688.

{¶ 58} With regard to the first element, a reviewing court must determine whether trial counsel's assistance fell below an objective standard of reasonable advocacy. *Bradley* at 141-142. To prove deficient performance, the defendant must show that

18.

counsel made errors which were so serious that, "were it not for counsel's errors, the result of the trial would have been different." *Id.*

{¶ 59} Trial strategy "must be accorded deference and cannot be examined through the distorting effect of hindsight." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 115. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland* at 691.

### The Absence of a Motion to Suppress

{¶ 60} Reynolds claims he was denied effective assistance of trial counsel based upon counsel's failure to file a motion to suppress his videotaped interview with police. He argues that his trial counsel should have challenged the admission of the videotape because it was not given voluntarily. Reynolds, however, does not argue that the police engaged in any coercion or misconduct during the interrogation; he argues instead that his statement was not voluntary based solely on his mental disease. He asserts that a motion to suppress, if made, would have been granted.

{¶ 61} The failure to file a suppression motion does not constitute a "per se case" of ineffective assistance of counsel. *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000), citing *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). The decision of whether or not to file a motion to suppress is a trial strategy. *State v. Phillips*, 74 Ohio St.3d 72, 85, 656 N.E.2d 643 (1995) ("Debatable trial tactics generally do not constitute a deprivation of effective counsel."). Thus, counsel's

19.

failure to file a motion to suppress constitutes ineffective assistance of counsel only if, based on the record, the motion would have been granted. *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 65.

**The Reading of *Miranda* Rights**

{¶ 62} Given that Reynolds made his incriminating statements to police during a custodial interrogation, our analysis must begin with whether the police properly apprised him of his rights in accordance with *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and, if so, whether he voluntarily waived those rights.

{¶ 63} Under *Miranda,* a suspect in police custody "'must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *State v. Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, 853 N.E.2d 279, ¶ 6-7, quoting *Miranda* at 479.

{¶ 64} Where a defendant proceeds to answer questions despite having received *Miranda* warnings and then later challenges incriminating statements as involuntary, the state must prove by a preponderance of the evidence that the defendant made a knowing, intelligent, and voluntary waiver of his *Miranda* rights. *State v. Gumm*, 73 Ohio St.3d 413, 429, 653 N.E.2d 253 (1995). The United States Supreme Court has explained that a valid waiver of *Miranda* rights requires the following:

20.

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct 1135, 89 L.Ed.2d 410 (1986); *See also Lather* at ¶ 7.

{¶ 65} A court may infer from the totality of the circumstances that a defendant voluntarily, knowingly, and intelligently waived his rights. *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 52. The totality of the circumstances includes "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." (Citation omitted). *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 25. "Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.'" *Lather* at ¶ 7, quoting *Moran* at 421. By definition of "totality," a court is to look to all of the evidence to determine a suspect's understanding, which can be implied by his conduct and the situation. *Id.* at ¶ 9.

**The Voluntariness of Reynolds' Waiver and Statement**

{¶ 66} At the beginning of the police interview, Detective Hahn said she wanted to talk to Reynolds. She explained, however, that in order to do so, it was "essential" that he understood what his rights were. She then segmented the *Miranda* rights, asking after she read each one, whether he understood it. When he confirmed that he did, he initialized each one individually on the waiver form. At the bottom of the form, Reynolds also acknowledged his *Miranda* rights, and waiver thereof, with his signature. Having a suspect sign a waiver form is "preferable" for purposes of waiver. *State v. Valentine*, 10th Dist. Franklin No. 14AP-893, 2016-Ohio-277, ¶ 15.

{¶ 67} Reynolds argues that his *Miranda* waiver and subsequent statement to the police were involuntary because he was mentally ill at the time of the police interrogation. He claims that a pre-*Miranda* case from the Supreme Court of the United States, *Blackburn v. Alabama*, 361 U.S. 199, 208, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960), supports the proposition that when police officers interrogate a mentally-ill suspect, any resulting confession is involuntary if it is "probable" that the suspect was mentally incompetent at the time of the interrogation.

{¶ 68} Reynolds, however, ignores *Colorado v. Connelly*, 479 U.S. 157, 164-65, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), a subsequent case in which the Supreme Court clarified that *Blackburn* should not be interpreted to imply that a defendant's mental condition, standing alone, should ever dispose of the inquiry into constitutional "voluntariness." Rather, the voluntariness of a defendant's waiver of *Miranda* rights—as

22.

well as the voluntariness of any resulting confession—"depend[s] on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Connelly* at 170. The Supreme Court of Ohio has expressly followed *Connelly* and held that "[t]he voluntariness of [a defendant's] statement depends on whether the police engaged in coercion and misconduct and not whether [the defendant] was mentally ill." *State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, ¶ 69.

{¶ 69} Thus, contrary to Reynolds' arguments, courts must not conduct "sweeping inquiries into the state of mind of a criminal defendant who has confessed [that are] quite divorced from any coercion brought to bear on the defendant by the State." *Connelly* at 167. The law is clear: the touchstone of an involuntary confession is police misconduct and the defendant's mental condition is merely one factor in the totality of the circumstances to be considered in determining constitutional voluntariness. *Hughbanks* at ¶ 61. The defendant's mental illness may, however, play a more significant role in the "voluntariness" calculus in instances where "[t]he police exploited this weakness with coercive tactics." *Connelly* at 164-65. But the focus of the court's analysis should always remain on the central issue of whether the police "overreached" by using improper interrogation techniques.

{¶ 70} Here, Reynolds does not allege that the police exploited his mental illness by eliciting either his *Miranda* waiver or subsequent confession through coercive tactics.

{¶ 71} Instead, Reynolds claims that the detectives should have terminated the interview after he told them that he was schizophrenic, took Risperal, and had not had

23.

any in a while, and because he occasionally referred to himself as a "premiere" and an "ambassador" during the interview, which demonstrates some delusional thinking. But, as discussed, a suspect's mental illness, standing alone, is insufficient to render either a *Miranda* waiver or subsequent confession involuntary.

{¶ 72} A similar argument was made in *State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, ¶ 50-66. In *Hughbanks,* the defendant was brought in for questioning on a ten year old, unsolved murder case. During the initial interview, the police advised the defendant of his *Miranda* rights. The defendant told the police that he had "conferred with a psychiatrist off and on" over the years. The interrogation lasted several hours, during which he did not confess. He was then given his *Miranda* rights again and given a polygraph test which proved to be inconclusive. A week later, following the defendant's consent and additional *Miranda* warnings, another polygraph test was given. During the pretest interview, the defendant disclosed that he had an extensive psychiatric history, though he had received no treatment or medication in the last year or two. Following the second test, the defendant admitted to the double murder. *Id.* at ¶ 50-66.

{¶ 73} On appeal, the defendant argued that because the police knew that he was mentally ill, they should have consulted a psychiatrist before any further questioning to find out whether his decision to waive his rights and answer police questions was "truly voluntary." Alternatively, he claimed that the police should have found him a lawyer.

24.

{¶ 74} Relying on *Colorado v. Connelly,* the Supreme Court of Ohio rejected the argument:

The police officers were not required to consult a psychiatrist or have [the defendant] evaluated by a psychiatrist to ensure that his waiver of rights and his statements were the product of his free will. * * * The police officers never subjected [him] to threats of physical abuse or deprived him of food, sleep, or medical treatment. Moreover, the police interview and polygraph testing * * * lasted only several hours. We find no evidence of police coercion or overreaching that might show [the defendant's] confession to be involuntary. *Id.* at ¶ 61, 63.

{¶ 75} Similarly here, we find that the police had no obligation to discontinue their interview of Reynolds because he was mentally ill, and their failure to do so did not impact the voluntariness of the waiver of his *Miranda* rights or his subsequent confession.

{¶ 76} This court's review of the record reveals no evidence of police coercion or overreaching: the videotaped interview demonstrates that the detectives always spoke to Reynolds in a calm and clear manner, they never threatened Reynolds or raised their voices, and they provided Reynolds with food and water at various intervals. In addition, the interview and forensic testing lasted less than three hours, which given all other circumstances was not an unreasonable length of time. Although detectives encouraged Reynolds throughout the interview to tell them what really happened, "admonitions to tell

25.

the truth made by police officers are considered neither threats nor promises and are permissible." *State v. Worley*, 11th Dist. Trumbull No. 2001-T-0048, 2002-Ohio-4516, ¶ 171. Finally, Reynolds remained alert, responsive, and lucid throughout the entire interview; there was nothing objectively apparent from his demeanor that should have alerted the detectives that he was incapable of understanding either the nature of his *Miranda* rights or the consequences of his waiver of those rights. Indeed, Reynold's own expert, Dr. Fabian, testified that Reynolds "was not internally preoccupied" and described Reynolds as "well-mannered," "responsive," and "appropriate." Dr. Rivera concurred.

{¶ 77} In sum, after considering the totality of the circumstances, we find that Reynolds' waiver of his *Miranda* rights and subsequent confession to the police were constitutionally voluntary. Reynolds therefore does not demonstrate that the trial court would have suppressed the statements he made to police had his counsel filed a motion to suppress. Accordingly, trial counsel was not ineffective. Reynolds' second assignment of error is not well-taken.

{¶ 78} On consideration whereof, we find that Reynolds was not prejudiced or prevented from having a fair trial, and the judgment of the Lucas County Court of Common Pleas is affirmed. Pursuant to App.R. 24, Reynolds is ordered to pay the costs of this appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                          _____
                                                          JUDGE

James D. Jensen, P.J.

                                           _____
Christine E. Mayle, J.                                    JUDGE
CONCUR.

                                           _____
                                                          JUDGE