**[Cite as *State v. Foos*, 2023-Ohio-3540.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY

State of Ohio                                                    Court of Appeals No. S-22-026

        Appellee

                                                  Trial Court No.  21 CR 632

v.

Jeremy Foos                                                   **DECISION AND JUDGMENT**

        Appellant                                      Decided:  September 29, 2023

* * * * *

Beth A. Tischler, Sandusky County Prosecuting Attorney, and
Alexis M. Otero, Assistant Prosecuting Attorney, for appellee.

Autumn D. Adams, for appellant.

* * * * *

**SULEK, J.**

{¶ 1} Appellant Jeremy Foos appeals the judgment of the Sandusky County Court

of Common Pleas convicting him, following a jury trial, of felonious assault, aggravated

burglary, and attempted murder.  On appeal, Foos argues that the jury's finding that he

did not establish the affirmative defense of not guilty by reason of insanity is against the

manifest weight of the evidence. For the reasons that follow, the trial court's judgment is affirmed.

## I. Factual Background and Procedural History

{¶ 2} On August 20, 2021, the Sandusky County Grand Jury entered a three-count indictment against Foos, charging him with one count of felonious assault in violation of R.C. 2903.11(A)(1) and (D)(1)(a), a felony of the second degree, one count of aggravated burglary in violation of R.C. 2911.11(A)(1) and (B), a felony of the first degree, and one count of attempted murder in violation of R.C. 2903.02(A) and 2923.02(A), a felony of the first degree.

{¶ 3} Foos entered a plea of not guilty by reason of insanity, and the trial court referred the matter to Dr. Thomas Sherman at Court Diagnostic & Treatment Center for an evaluation. The results of that evaluation found that Foos was competent to stand trial, but that Foos was not guilty by reason of insanity. The state requested a second evaluation, which was completed by Dr. Mark Babula at Central Behavioral Healthcare. Babula reached the opposite conclusion from Sherman and found that Foos failed to satisfy the not guilty by reason of insanity standard. Foos initially suggested a third evaluation, but ultimately withdrew his request.

{¶ 4} The matter proceeded to a jury trial. At the trial, Foos did not contest his actions on the day of the incident. Instead, he relied entirely on his argument that he lacked the mental capacity to form the required mens rea.

2.

**{¶ 5}** L.F., Foos's mother testified first and stated that Foos had a history of anger issues. Foos told his mother at one point that he was bipolar and was on medication, but then he stopped taking his medication and became increasingly angry. L.F. testified that in May 2021, prior to the incident at hand, Foos came to her house in a rage, broke out a garage window, and then left. After that, L.F. changed her garage code, installed security cameras, and contacted a mental health organization to seek help for her son. L.F. then sought and obtained a 45-day temporary protection order.

**{¶ 6}** On August 15, 2021, L.F. received a call from her brother-in-law, T.R., who warned her that Foos was in a rage and that she should not contact him. While L.F. was on the phone with T.R., she saw Foos approaching her back door. Foos picked up a landscaping rock and threw it through the backdoor window, shattering the glass. Video shows Foos breaking into the home and attacking L.F. L.F. testified,

> When he came, I just started screaming that he's here… he's here… and when he took my phone and threw my phone, it didn't disconnect, so [T.R.] heard everything, and he had his wife call 9-1-1, and then he raced to my house, but [Foos], when he threw the phone, he said, you're going to tell me what's going on. I'm -- I don't know what -- you know, he just had been blaming us for things happening in his life and just, I'd -- really wasn't sure what he meant by, you're going to tell me what's going on, but then he choked me and had his hands on my neck and then he did like, a wrestling move or something, but he, like, put me down on the ground, and

3.

he was sitting on me.  He was spitting in my face.  He hit me aside the head really -- on this side, real hard, (indicating), and he grabbed my thumb and said he should break my thumb, and then he put his -- put his mouth on both of my cheeks, and said, I should rip your face right off and then -- then I'm pretty -- it was the part that the video showed where he got off of me and then was kicking me, and, um, he -- he did -- he hit me again aside the head and then I did get up.  He was off of me, and I got up, and I was standing looking out my back windows and that's when he choked me again, and then I was unconscious.  He choked me until I was unconscious, and then I was laying on my floor in a different direction, so… I don't know if he, like, laid me down or if he threw me down after I was unconscious, but then when I came to, he was sitting on top of me, and then a couple minutes later is when [T.R.] came in.

    \* \* \*

[H]e told me more than once, I'm going to kill you.  Like, right after he choked me the first time, he said, I'm going to kill you, and then I don't know if he thought that I called 9-1-1, but he said if I hear sirens, you're dead, and then he told me again, I'm going to kill you, and then, you know, all the -- you know, sitting on me and spitting on my face, and then when I got up, he -- he said at one point, he said, you know I'm going to jail for this, and that was before he -- he choked me again and I was unconscious.

As a result of the attack, L.F. suffered a serious concussion as well as injuries and bruising to her face, chin, neck, chest, and arms.

{¶ 7} On cross-examination, L.F. testified that around October 2020, Foos began having more difficulty. He was having a hard time going through a divorce and with his father dying. L.F. testified that around that time Foos rode with L.F. and some other family members to an out-of-town gender reveal party. Foos drank heavily at the party and became intoxicated. On the drive home, Foos became belligerent and threatened L.F.

{¶ 8} L.F. also testified that after the May 2021 incident, in addition to contacting the mental health organization, L.F. had Foos involuntarily committed for a mental health evaluation at Firelands. L.F. testified that Foos would have delusions about Facebook posts and even accused L.F. of dressing as an old woman and walking by his house to spy on him.

{¶ 9} The state next called T.R., who testified that on the day of the incident he had spoken with Foos and attempted to calm him down. T.R. testified that Foos would often "vent" to him and that he had typically been successful in helping Foos calm down. On this day however, Foos appeared to be particularly agitated. T.R. contacted L.F. to warn her and then remained on the phone when he heard Foos attacking her. T.R. rushed to L.F.'s home, which was about a five-to-ten-minute drive, where he tackled Foos off of L.F. T.R. then wrestled with Foos for a few minutes trying to control his hands until the police arrived. T.R. testified that when the police arrived, Foos stated, "you called the

5.

f***ing cops." Foos then ran towards a window attempting to break through it and flee. The police officers told Foos to stop, and then tased him.

{¶ 10} On cross-examination, T.R. testified that when he spoke with Foos on August 15, 2021, he was worried that Foos's mental health was deteriorating and that he was approaching rock bottom. In the past, Foos would vent about situations and say that he was going to kill people, but would always acknowledge that he knew that was wrong and would never do that. On August 15, however, Foos was more agitated than usual. Foos had a delusion that there was a conspiracy involving a Facebook post, and for the first time thought that T.R. was part of the conspiracy along with L.F., the police, and another person.

{¶ 11} Sandusky County Sheriff's Deputy Bradley Reynolds also testified. Reynolds authenticated body-worn camera footage taken on August 15, 2021. The first video shows Foos being tased as he is trying to kick out the window. After he is placed into handcuffs, Foos complains that the taser is in his spine. He then tells Reynolds that he is going to move to his side to open his airway. Foos then says that everyone is "f***ing lying to me," and that L.F. is "going to hell for lying" to him.

{¶ 12} The second video shows Reynolds interviewing Foos in the hospital. Foos tells Reynolds that everything that is happening is "straight out of a Facebook post" from over a year ago, where people, including L.F., are causing these things to happen to him. Foos stated that either that is what is going on, or he is insane. When Reynolds tells Foos to explain his story to the judge, Foos responds that he will "just plead insanity because

6.

that's what I am." He stated that he guessed he should just "be put on meds." Foos then continued with his belief that this is all from a Facebook post and that a whole bunch of people are lying. When discussing why he confronted his mom, Foos explained that his mom had been lying to him. Foos then accused Reynolds of not believing him.

{¶ 13} Reynolds testified that he had a previous relationship with Foos from child custody issues that Foos was having. Foos contacted the police because he was not getting visitation with his son as he was supposed to on Thursdays. For several weeks, on Thursdays, Foos would contact the police and make a report. Reynolds testified that during their discussions, Foos was "levelheaded," albeit a little upset and agitated over not being able to see his child, and that the two were able to have good conversations.

{¶ 14} The last witness called by the state was Dr. Mark Babula, the licensed psychologist at Central Behavioral Healthcare who conducted the second evaluation of Foos on March 15, 2022. In completing his evaluation of Foos, Babula reviewed relevant medical records and police reports, spoke with T.R., interviewed Foos, and conducted psychological testing. Babula testified that Foos had several mental health issues such as depression and believing that others were involved in a conspiracy against him based on the contents of a Facebook post. Babula noted that these issues had been recurring, but previously Foos had been able to recognize that becoming violent or following through on threats was wrong. During those times, Foos was able to be talked down by T.R. That led Babula to conclude that Foos was capable of understanding the wrongfulness of his conduct on August 15, 2021. Babula determined that although Foos was capable of

7.

understanding the wrongfulness of his conduct, on that particular day Foos consumed an abnormal amount of beer and vaped THC, which Foos reported may have been laced with something because he had a different feeling after vaping it. Foos even acknowledged that he might not have gone over to his mother's house on August 15, 2021, if he had not consumed so much alcohol. Babula testified that those substances agitated Foos and lowered his inhibitions causing him to care less about whether his actions were right or wrong. Babula summarized,

> So on this specific day, although, he knows right and wrong, he's been able to distinguish that before. He can distinguish that after. The difference is that he's agitated and his inhibitions are lower, so it's not that he's unable to identify that it's right or wrong, essentially the anger and the decreased inhibitions -- he -- he cares less, and, again, there were other statements that he cared less; that he had nothing -- nothing to lose, so it wasn't that he didn't know right from wrong; is (sic) that on this date he had fewer inhibitions, and he didn't care for various reasons. He stopped caring about the rightness or wrongfulness of those reasons.

{¶ 15} Following Babula's testimony, the state admitted its exhibits and rested. Foos then made a Crim.R. 29(A) motion for acquittal on the counts of felonious assault and attempted murder, which the trial court denied.

{¶ 16} Foos then called Dr. Thomas Sherman as his only witness. Sherman is a licensed psychiatrist and the Medical Director at Court Diagnostic Center. Sherman

8.

conducted the first evaluation of Foos on November 16, 2021, and determined that he met the standard for not guilty by reason of insanity. Like Babula, Sherman reviewed the medical records and police reports and spoke with Foos. Sherman did not, however, speak with T.R., although he read T.R.'s voluntary statement to the police. Based upon his evaluation, Sherman concluded that Foos was incapable of understanding the wrongfulness of his actions at the time of the offense. Sherman explained,

[W]e're dealing with knowledge of wrongfulness, okay, and to know something, your cognitive functions have to be reasonably intact. He thought what he was doing was basically saving his life or certainly preventing him from being persecuted. He developed this odd belief that somehow or other, he -- a Facebook post that he had paste -- posted years before this had become something that was well-known. It was well-known over the internet, that his family had something to do with persecuting him. You know, the thing about not guilty by reason of insanity is, to me, one of the things involved is how -- how strange are these actions? * * * He was trying to bite her, the victim, he was totally out of control. Even some of the witnesses were talking about that he had mental issues. He was talking irrationally. Pretty, clearly, this guy's mental status at the time of the offense was pretty upset, so much so that I think, in my opinion, my medical opinion, that that was sufficient enough

9.

to have prevented him from knowing the wrongfulness of his acts, criminal intent.

{¶ 17} When asked about Foos's consumption of alcohol on the day of the offense, Sherman acknowledged the issue, but concluded that the offense could not be explained simply on the basis of intoxication. In support, Sherman noted that Foos had been seriously mentally ill for several years before the offense. Further, Foos maintained his same delusions regarding the Facebook post several weeks after the offense when he was completely sober. In addition, Sherman noted that individuals who are not guilty by reason of insanity often do not have a good recollection of the crime that was committed in the midst of a psychosis, and in this case Foos had almost no recollection of the events. Sherman agreed on cross-examination, however, that shortly after the event Foos was speaking about it with Reynolds.

{¶ 18} After Sherman's testimony, the defense rested. Following closing arguments and jury instructions, the jury retired to deliberate. Ultimately, the jury returned with a verdict of guilty on all counts.

{¶ 19} At sentencing, the trial court found that the offenses of felonious assault and attempted murder merged, with the state electing to proceed to sentencing on the count of attempted murder. The trial court ordered Foos to serve an indefinite prison term of 8-12 years on the count of attempted murder, to be served concurrently with an eight-year prison term on the count of aggravated burglary.

10.

## II. Assignment of Error

{¶ 20} Foos has timely appealed his judgment of conviction, asserting one assignment of error for review:

> 1. Foos proved by a preponderance of the evidence his defense of not guilty by reason of insanity, therefore the jury's guilty verdicts were against the manifest weight of the evidence.

## III. Analysis

{¶ 21} In determining whether a conviction is against the manifest weight of the evidence, an appellate court, sitting as a "thirteenth juror," reviews "the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 22} Here, Foos does not argue that his conduct failed to meet the elements for the offenses of felonious assault, aggravated burglary, and attempted murder. Instead, he argues only that he was not capable of formulating the required mens rea for the offenses, and thus should have been found not guilty by reason of insanity.

11.

{¶ 23} "Insanity is an affirmative defense that must be proven by a preponderance of the evidence." *State v. Reynolds*, 2017-Ohio-1478, 89 N.E.3d 235, ¶ 48 (6th Dist.), citing *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 35; R.C. 2901.05(A) ("The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense other than self-defense, defense of another, or defense of the accused's residence * * * is upon the accused."). "The accused must persuade the trier of fact that 'at the time of the commission of the offense, the [accused] did not know, as a result of a severe mental disease or defect, the wrongfulness of the [accused's] acts.'" *Hancock* at ¶ 35, quoting R.C. 2901.01(A)(14). "The weight to be given the evidence and the credibility of the witnesses concerning the establishment of the defense of insanity in a criminal proceeding are primarily for the trier of facts." *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982); *Reynolds* at ¶ 55.

{¶ 24} In this case, the jury was presented with competing experts. Both experts agreed that Foos suffered from serious mental illness, but they differed in their determination of whether Foos was able to understand the wrongfulness of his conduct.

{¶ 25} Babula testified that Foos, although suffering from delusions, was able to understand the wrongfulness of his conduct as evidenced by his ability on prior occasions to be calmed down by T.R. and to recognize that harming or killing people was wrong and that he should not do it. According to Babula, on this particular instance however, Foos stopped caring because he had consumed a lot alcohol and had vaped THC, which

12.

agitated him and lowered his inhibitions. Foos even acknowledged that he probably would not have gone over to his mother's house had he not consumed so much alcohol. Further, during the attack, Foos appeared to understand that his conduct was wrong when he told his mother that he would kill her if he heard sirens, told his mother that he was going to go to jail, and yelled at T.R. for calling the police.

{¶ 26} In contrast, Sherman testified that Foos was not able to understand the wrongfulness of his conduct as evidenced by Foos's delusions that he was being persecuted over a Facebook post and thus thought he was acting to save his life or avoid persecution. Sherman recognized that Foos's conduct was bizarre, he was attempting to bite his mother, he was "totally out of control," and he was speaking irrationally. When confronted with the issue of Foos's intoxication, Sherman downplayed its effect, noting that Foos had been suffering from these delusions for a while and continued to suffer from them at the hospital weeks later when he was sober.

{¶ 27} Upon a thorough review of the record as a thirteenth juror, the evidence does not establish that the jury clearly lost its way and created a manifest miscarriage of justice when it did not find Foos not guilty by reason of insanity. Babula's testimony was cogent, well-supported, and took into consideration all of the facts and circumstances of the case. Although Sherman also provided compelling testimony that reasonably could have convinced the jury, the jury ultimately found Babula's opinion more persuasive. As such, this is not the exceptional case where the evidence weighs heavily against the conviction.

13.

**{¶ 28}** Therefore, Foos's conviction is not against the manifest weight of the evidence and his assignment of error is not well-taken.

## IV. Conclusion

**{¶ 29}** For the foregoing reasons, the judgment of the Sandusky County Court of Common Pleas is affirmed. Foos is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.

_____
JUDGE

Gene A. Zmuda, J.

_____

Charles E. Sulek, J.
CONCUR.

JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.