[Cite as *State v. Penn*, 2021-Ohio-1761.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
FULTON COUNTY

State of Ohio                                          Court of Appeals No. F-20-004

     Appellee                                        Trial Court No. 19CR18

v.

Marcus L. M. Penn                              **DECISION AND JUDGMENT**

     Appellant                                       Decided:  May 21, 2021

* * * * *

Scott A. Haselman, Fulton County Prosecuting Attorney,
for appellee.

Clayton M. Gerbitz, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Appellant, Marcus Penn, appeals both the judgment entry of sentence journalized by the Fulton County Court of Common Pleas on April 10, 2020, and the judgment entry nunc pro tunc journalized by the same court on April 14, 2020, sentencing him to prison for attempted murder.  For the reasons that follow, we affirm the judgments of the trial court.

{¶ 2} Appellant sets forth the following assignments of error:

I. The trial court erred in finding that Appellant voluntarily, knowingly, and intelligently waived his *Miranda* rights.

II. Appellant's sentence is contrary to law and not supported by the record.

## Statement of the Case

{¶ 3} On February 11, 2019, appellant was indicted one count of attempted murder in violation of R.C. 2903.02(A) and 2923.02(A), a felony of the first degree (Count 1); one count of felonious assault in violation of R.C. 2903.11(A)(2), a felony of the second degree (Count 2); one count of felonious assault in violation of R.C. 2903.11(A)(1), a felony of the second degree (Count 3); and one count of domestic violence in violation of R.C. 2919.25(A) with a specification of a prior conviction, a felony of the fourth degree (Count 4). Each of the four counts included a three-year firearm specification pursuant to R.C. 2941.145(A) and 2929.14(B)(1)(a)(ii).

{¶ 4} Appellant was arraigned on February 19, 2019. The court advised appellant of the charges and penalties, appointed counsel to represent him, and set bond at $2 million. Appellant, through counsel, entered pleas of not guilty and not guilty by reason of insanity ("NGRI"). Further, appellant requested a competency evaluation, which the court ordered to be conducted by the Court Diagnostic and Treatment Center.

{¶ 5} On July 2, 2019, the court conducted a competency hearing pursuant to R.C. 2945.37. The Court Diagnostic and Treatment Center NGRI and competency evaluations

2.

were admitted with the consent of both parties. Upon consideration of the evaluations, the court found that appellant was sane at the time of the alleged offenses and was competent to stand trial.

{¶ 6} Appellant filed a motion to suppress his statements to law enforcement. On October 1, 2019, the court conducted an evidentiary hearing on the matter. After considering the testimony adduced and the arguments of counsel, the court denied the motion in a judgment entry dated October 10, 2019.

{¶ 7} On January 24, 2020, appellant entered a plea of no contest to Count 1 of the indictment (attempted murder, with the firearm specification) and to Count 4 of the indictment (domestic violence, with the prior conviction specification). The court ordered a presentence report and continued bond. On April 2, 2020, the court merged the two counts and sentenced appellant to a term of 11 years in prison on the charge of attempted murder, together with a term of 3 years in prison for the firearm specification. The terms were ordered to be served consecutively. On April 14, 2020, the court filed a judgment entry nunc pro tunc, correcting paragraph three of the original sentencing judgment entry that was filed on April 10, 2020. Appellant timely appealed these entries.

**Statement of the Facts**

{¶ 8} Evidence of the following was adduced at the October 1, 2019 suppression hearing. On January 26, 2019, Benigno Salazar, an officer with the Toledo Police Department, came into contact with appellant. Salazar was dispatched when appellant's family reported that appellant was intoxicated and waving a gun around.

3.

{¶ 9} As Salazar arrived on the scene, but was still approximately 50 yards from the house, appellant came around the side of the house, threw down the gun, and laid down in the snow as if he was giving himself up. Salazar believed that appellant threw down the gun in the manner that he did in order to make it clear to the officer that appellant no longer possessed the gun. Appellant undertook all of these actions while Salazar was still in his vehicle.

{¶ 10} Appellant appeared disheveled and was heavily intoxicated, with Salazar able to smell the alcohol. Salazar handcuffed appellant and placed him in the back of his patrol car, as appellant was going to be taken to jail and charged with possession of a firearm while intoxicated. Salazar also spoke with appellant's sister, who had called the police when she thought that he might have been suicidal. Once in the patrol car, appellant indicated that he needed some medication and requested to go to St. Charles Hospital. Salazar told him, "[N]o, you are going to jail."

{¶ 11} Salazar did not read appellant his *Miranda* rights, because it is the Toledo Police Department's policy that patrolmen do not question suspects. Instead, the Toledo Police Department's policy is to have detectives *Mirandize* suspects just prior to, and in connection with, their formal questioning. Given this policy, Salazar did not interview, interrogate, or question appellant as Salazar was driving appellant to jail. At one point, while Salazar was discussing with appellant the charges that would be filed against him, appellant became irritated and volunteered a statement to the effect that he had killed a female, and that such was the only offense for which he would be charged. He further

4.

volunteered words to the effect that the devil made him do it, or that the devil told appellant to set her free. Following appellant's statement that he had killed someone, Salazar asked appellant why he had plastic gloves on his hands, but thereafter Salazar refrained from asking any further questions.

{¶ 12} Given appellant's statement, Salazar decided not to drive appellant to the jail, and, instead, took him to speak with Detective Jeff Quigley. As they were driving, appellant asked Salazar if he wanted to "know"—a statement that Salazar took to mean that appellant was asking Salazar if he wanted appellant to keep talking. Salazar did not respond, stating only that they were going to talk with someone else. During the drive, Salazar noticed appellant mumbling in the back seat of the patrol car, as if he were talking to somebody who was not there.

{¶ 13} Once appellant was brought to Quigley for questioning, and prior to his being questioned, appellant's handcuffs were removed. Appellant, who was 30 years old, was read his *Miranda* rights, he acknowledged that he understood those rights, and he affirmatively waived them. Although the questioning only lasted about 45 minutes (and for much of that time Quigley was out of the room), appellant was provided with cigarettes, food, and water. Appellant refused a bag of candy that was provided, stating that he was allergic to chocolate.

{¶ 14} According to Quigley, although appellant was emotional, crying, and upset, it appeared that he understood what Quigley was saying, never giving any indication to the contrary. Supporting Quigley's testimony was the video of the interview, which

5.

showed appellant begin to orally articulate his *Miranda* rights along with Quigley as Quigley read them aloud. When Quigley was speaking with appellant, appellant engaged directly with him and did not appear disoriented or confused, although Quigley acknowledged that appellant had indicated something to the effect that the devil made him do it. When Quigley left the room, appellant would talk to himself and, further, indicated that he was hearing voices. Appellant told Quigley that he suffered from schizophrenia/bipolar and rage disorder and that he had not slept in nine days. He also told Quigley that he wanted to go to St. Charles Hospital so he could get his medication.

{¶ 15} During the interview, appellant stated that he had shot his "wife" in Swanton and he provided Quigley with his wife's name and address.[1] Appellant also stated that there was a two-month-old baby in the home. Quigley passed this information along to the Fulton County sheriff's office so that they could check on the wife's safety. As a result of the safety check, it was discovered that the victim described by appellant had, in fact, been shot at the address appellant had provided.

{¶ 16} Approximately five and one-half hours after Quigley's interview ended, Lieutenant Chris Blosser of the Swanton Police Department reported to the Toledo Police Department to conduct a follow-up interview of appellant. Blosser confirmed that appellant had been *Mirandized* and informed appellant that those rights were still in effect. Blosser then asked appellant if he was willing to speak with Blosser, and

---

[1] During the interview process, appellant variously referred to the victim as his wife, fiancée, and as the mother of his youngest child.

6.

appellant stated that he was willing to do so. During this second interview, appellant's handcuffs were again removed, and appellant was provided with cigarettes and water.

{¶ 17} According to Blosser, appellant did not appear to be confused. This testimony was supported by video of the interview, which showed that appellant was much less emotional and distraught than he had been while being questioned by Quigley. Blosser believed that appellant knew what was occurring and testified that appellant had been able to effectively communicate with him.

{¶ 18} During the course of the interview, appellant acknowledged that he and the victim had moved to Swanton a few months earlier. Appellant told Blosser that he had shot his girlfriend in Swanton. Appellant knew that the gun that was used to shoot the victim was a .380. Further, appellant was able to provide Blosser with the code to the victim's cell phone so that law enforcement personnel could contact the victim's family, and he specifically identified who the officers should contact. Appellant stated that he knew he would be going to jail and he asked Blosser if he could be segregated while at the Corrections Center of Northwest Ohio, rather than being put in with other inmates, as he feared repercussions from his prior life as a gang member. Appellant reiterated that the devil had made him shoot his girlfriend, in order to set her free. The interview was roughly 22 minutes in length.

{¶ 19} Based on the evidence presented, the trial court, in overruling appellant's motion to suppress, made the following findings of fact and conclusions of law. Salazar did not *Mirandize* appellant, but because appellant's statement to Salazar that appellant

7.

had killed someone was made spontaneously, and was not made in response to questioning, there was no violation of appellant's *Miranda* rights.

{¶ 20} With respect to appellant's interaction with Quigley, the trial court stated:

\* \* \* Detective Quigley refused to allow the Defendant to make any statements until the Defendant was mirandized. The Defendant indicated before the *Miranda* warnings were given, that he understood his rights. In the video which was presented, the Defendant began stating the rights simultaneously with Detective Quigley. The Defendant indicated he understood his rights. The Defendant then stated that he thought he had killed his fiancée.

\* \* \*

During the period while the detective was not in the office, the Defendant appeared to have a running conversation with the voice in his head. However, the Defendant had no trouble responding to the detective's questions. The Defendant frequently asked what was going to happen to him; what charges he was going to receive; and if he could be taken to St. Charles Hospital. The Defendant was also cognizant of the fact that he was allergic to chocolate and could not eat the M&M's that had been provided by Detective Quigley.

\* \* \*

8.

In reviewing the totality of the circumstances, the Court notes the Defendant was aware of his constitutional rights and in fact began quoting them along with Detective Quigley. The Defendant indicated that he was suffering from mental illness, had not taken his meds, had not slept, and was concerned for his fiancée's well-being because there was one less bullet in the chamber of the gun. The Defendant knew that it was possible he might be incarcerated and indicated to the detective he preferred to go to St. Charles Hospital to get his medication. The Defendant repeatedly asked what was going to happen to him as a result of what he did to his fiancée. The Defendant repeatedly said [and the court is paraphrasing here] that he had made a terrible mistake and people don't do this sort of thing to people they care for. All this indicates the Defendant was cognizant of his surroundings, the seriousness of what may have happened and the jeopardy into which he had placed himself.

The Defendant had no problem responding to Detective Quigley's questions. He was aware of the potential consequences for his actions. He never claimed the voices in his head were telling him to confess. He simply indicated the voices in his head were the reason he shot his fiancée -- to set her free.

9.

Based on the totality of the circumstances, this Court believes the Defendant's confession was knowingly and voluntarily given after surrendering his constitutional rights as contained in the *Miranda* warning.

{¶ 21} Finally, with respect to appellant's interaction with Blosser, the trial court recognized that: (1) Blosser had asked appellant if he remembered the *Miranda* warnings that he had been given previously; (2) appellant acknowledged that he did remember the warnings; (3) Blosser reiterated that the warnings were still applicable to Blosser's questioning; and (4) appellant acknowledged that he understood. The trial court then stated:

> In this case, the lapse of time was not significant other than it provided the Defendant an opportunity to compose himself. The interrogations occurred in the same building although not in the same room. The Defendant acknowledged he recalled his *Miranda* warnings and understood they were applicable to the second interview. The statement the Defendant made did not significantly differ from (in fact the second statement was almost identical to) the first statement. The Defendant was far less stressed than he was during the initial interview by Detective Quigley.

{¶ 22} At the sentencing hearing, the trial court heard from counsel, appellant, and the victim's mother, who spoke on the victim's behalf. The victim's mother described her family's anguish, having been told by the doctors that they should "pull the plug" on

10.

the victim, whose skull had been pierced by the bullet through her right eyebrow. The victim's mother described the extensive rehabilitation that her daughter has had to undergo, which has allowed her daughter to speak again. Unfortunately, given the damage that was done, the victim can still see out of only one eye. The victim's mother further described how her daughter had laid in the hospital for over one year, since "[s]he can't help herself at all," and that "[w]ithout help she just lays there." The victim's mother also made the trial court aware of the victim's recollection of the incident, describing how the victim was afraid as appellant placed the gun up to her head while she was down on her knees trying to keep him from shooting their baby.

{¶ 23} When the trial court sentenced appellant, it expressly stated in its judgment entry of sentence that it had considered "the record, oral statements, any victim impact statement and presentence report prepared, as well as the principles and purposes of sentencing under O.R.C. §2929.11," and that it had "balanced the seriousness and recidivism factors under O.R.C. § 2929.12." At the sentencing hearing, the trial court additionally provided:

> The Court has considered the record, the oral statements, the victim
> impact statement, presentence report, the purposes and principles of
> sentencing under Revised Code Section 2929.11[,] [t]he seriousness and
> recidivism factors relevant to the offense and the offender pursuant to
> Revised Code Section 2929.12, and the need for deterrent, incapacitation
> and rehabilitation. I'm always guided by the overriding purposes of felony

11.

sentencing, including protection of the public from future crime by this offender and others, while punishing the offender using the minimum sanctions the Court determines it necessary to accomplish those purposes without imposing an unnecessary burden on either State or local government resources.

In reviewing this case, the Court would note the offender has a history of some criminal convictions * * *. The offender clearly has not been rehabilitated and has not responded favorably to sanctions previously imposed. I would disagree with the other finding in this report however that the offender shows no genuine remorse. I believe that he does. * * *.

* * * Those factors the Court is required to look at making the offense more serious, it's clear here that the victim suffered horrendous physical injuries. The offender's relationship with the victim facilitated the offense. And this is essentially an act of domestic violence, aggravated assault, so felonious assault. I also agree with the Prosecutor, who indicated he, at the time of sentencing that these two charges probably merged and they do. There isn't any doubt in my mind and the Prosecutor has elected to move forward on the charges of attempted murder.

The Court finds having considered the factors set forth in Revised Code Section 2929.12, that a prison term is consistent with the principles and purposes of sentencing set forth in Revised Code Section 2929.11, and

that the Defendant is not amenable to an available community control sanction. The Court further finds that a combination of community control sanctions would demean the serious [sic] of the Defendant's conduct and that conduct's impact on the victim, and that a sentence of imprisonment is commensurate with the seriousness of the Defendant's conduct and its impact on the victim. And that a prison sentence does not place an unnecessary burden on State government resources.

That having been said the Defendant is hereby sentenced to a term of eleven years to be served at the Department of Rehabilitation and Correction. The Defendant is further ordered to serve three years for the firearm specification attached to Count I, to which the Defendant has pled in addition to the eleven years.

## Analysis

{¶ 24} Appellant argues in his first assignment of error that the trial court erred in finding that appellant voluntarily, knowingly, and intelligently waived his *Miranda* rights. This court, in *State v. Ruffer*, 6th Dist. Fulton No. F-11-007, 2012-Ohio-4491, articulated the applicable standard of review for a trial court's denial of a motion to suppress, as follows:

Review of a trial court's denial of a motion to suppress presents mixed questions of law and fact. *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "When considering a motion to suppress,

the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972." *Id.* An appellate court defers to a trial court's factual findings made with respect to its ruling on a motion to suppress where the findings are supported by competent, credible evidence. *Id.; State v. Brooks*, 75 Ohio St.3d 148, 154, 661 N.E.2d 1030 (1996). "[T]he appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard. *State v. McNamara* (1997), 124 Ohio App.3d 706, 707 N.E.2d 539." *State v. Burnside* at ¶ 8.

*Id.* at ¶ 5.

{¶ 25} The law is clear that "the requirement that police officers administer *Miranda* warnings applies only when a suspect is subject to both custody and interrogation." *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 119. "An unsolicited and spontaneous statement * * * is not the product of interrogation, so *Miranda* does not apply. *Id.*; *see also State v. Beightler*, 3d Dist. Hardin No. 6-18-11, 2019-Ohio-4522, ¶ 16, 19. In the instant case, the trial court specifically held, on the basis of competent, credible evidence, that appellant's statements to Salazar were spontaneously made, and therefore were not subject to *Miranda*. We agree with this conclusion.

14.

**{¶ 26}** Next, we consider appellant's statements to Quigley and Blosser, all of which were clearly made within the context of a custodial interrogation. "Prior to a custodial interrogation, the Fifth Amendment requires that a suspect receive *Miranda* warnings to protect against self-incrimination." *State v. Velliquette*, 6th Dist. Lucas No. L-19-1232, 2020-Ohio-4855, 160 N.E.3d 414, ¶ 13 (citations omitted) (quotations omitted). Thus, "the prosecution may not use statements obtained through a custodial interrogation that lacked the requisite *Miranda* safeguards." *Id.* (Citations omitted.) Where, as here, a suspect proceeds to answer questions after having received *Miranda* warnings and then later challenges incriminating statements as involuntary, "the state must prove by a preponderance of the evidence that the defendant made a knowing, intelligent, and voluntary waiver of his *Miranda* rights." *State v. Reynolds*, 6th Dist. Lucas No. L-16-1021, 2017-Ohio-1478, 89 N.E.3d 235, ¶ 64.

**{¶ 27}** To be a valid waiver, two conditions must be satisfied:

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (citations omitted). Factors to consider when evaluating the totality of the circumstances include "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 25. "By definition of 'totality,' a court is to look to all of the evidence to determine a suspect's understanding, which can be implied by his conduct and the situation." *Reynolds* at ¶ 65.

{¶ 28} In the instant case, appellant does not argue that the police engaged in any coercion or other misconduct during his interrogations; instead, he argues that his statements were not voluntary based solely on his "mental defects/distress." In evaluating this argument, we are mindful that "the touchstone of an involuntary confession is police misconduct and the defendant's mental condition is merely one factor in the totality of the circumstances to be considered in determining constitutional voluntariness." *Reynolds* at ¶ 69. Stated otherwise, "the voluntariness of a defendant's waiver of *Miranda* rights -- as well as the voluntariness of any resulting confession -- 'depend[s] on the absence of police overreaching, not on "free choice" in any broader sense of the word.'" *Id.* at ¶ 68, quoting *Colorado v. Connelly*, 479 U.S. 157, 170, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *see also State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, ¶ 69 ("The voluntariness of [a defendant's] statement depends on whether the police engaged in coercion and misconduct and not whether [the

16.

defendant] was mentally ill."). Thus, "a suspect's mental illness, standing alone, is insufficient to render either a *Miranda* waiver or subsequent confession involuntary." *Reynolds* at ¶ 71.

{¶ 29} Our review of the record reveals no evidence of police coercion or overreaching. The Quigley interview of the then 30-year-old appellant was not confrontational in any way, and it lasted for only 45 minutes. During Quigley's questioning, appellant was not handcuffed and he was provided with cigarettes, food, and water. While appellant was emotional and upset, he indicated that he understood his rights, he answered Quigley's questions appropriately, and he appeared to understand what was happening.

{¶ 30} The Blosser interview, which took place roughly five and one-half hours after Quigley's interview ended, was likewise not confrontational in any way, and it lasted only about 22 minutes. During Blosser's questioning, appellant was not handcuffed and he was provided with cigarettes and water. Appellant, who was much less emotional than during his interview with Quigley, indicated that he understood his rights, he answered Blosser's questions appropriately, and he appeared to understand what was happening.

{¶ 31} Considering the totality of the circumstances, we find that appellant's waiver of his *Miranda* rights and his subsequent confessions to the police were constitutionally voluntary. Accordingly, appellant's first assignment of error is found not well-taken.

17.

{¶ 32} Appellant argues in his second assignment of error that his sentence is contrary to law and is not supported by the record, because the trial court only expressly acknowledged two of the three overriding purposes of felony sentencing that are set forth in R.C. 2929.11.

{¶ 33} R.C. 2953.08(G)(2) allows an appellate court to "increase, reduce, or otherwise modify a sentence" or "vacate the sentence and remand the matter to the sentencing court for resentencing" if it clearly and convincingly finds "(a) [t]hat the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant," or "(b) [t]hat the sentence is otherwise contrary to law."

{¶ 34} There is no question that the first prong, under R.C. 2953.08(G)(2)(a), is inapplicable to the analysis at hand. Therefore, we are left to examine whether the sentences are clearly and convincingly "otherwise contrary to law" as provided for in R.C. 2953.08(G)(3)(b).

{¶ 35} R.C. 2929.11, which addresses the overriding purposes of felony sentencing, relevantly provides:

> (A) A court that sentences an offender for a felony shall be guided by the overriding purposes of felony sentencing. *The overriding purposes of felony sentencing are to protect the public from future crime by the offender and others, to punish the offender, and to promote the effective*

*rehabilitation of the offender* using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources. To achieve those purposes, the sentencing court shall consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both.

(B) A sentence imposed for a felony shall be reasonably calculated to achieve the three overriding purposes of felony sentencing set forth in division (A) of this section, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders.

*Id.* (Emphasis added).

{¶ 36} According to appellant, the court, in expressly addressing the purposes of (1) protecting the public from future crime by the offender, and (2) punishing the offender, "specifically omit[ted]" the third factor of promoting the effective rehabilitation of the offender, and, therefore "could not have considered the effective rehabilitation of [appellant] when ordering that he serve the maximum sentence of 14 years in prison."

{¶ 37} This court has previously recognized that where a trial court has considered the purposes and principles of sentencing in R.C. 2929.11, has considered the sentencing

19.

factors listed in R.C. 2929.12, has properly applied postrelease control, and has sentenced the defendant within the statutorily permissible range, the sentence was not clearly and convincingly contrary to law. *See State v. Tammerine*, 6th Dist. Lucas No. L-13-1081, 2014-Ohio-425, ¶ 15, citing *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124, ¶ 18. "A trial court's statement that it has considered R.C. 2929.11 and 2929.12 in determining a sentence is sufficient to show the court's compliance." *State v. Acosta*, 6th Dist. Lucas Nos. L-20-1068, L-20-1069, 2021-Ohio-757, ¶ 12. Further, "[n]othing in R.C. 2953.08(G)(2) permits an appellate court to independently weigh the evidence in the record and substitute its judgment for that of the trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12." *State v. Jones*, Slip Opinion No. 2020-Ohio-6729, ¶ 42.

{¶ 38} First, we note that the permissible statutory sentencing range for a felony of the first degree such as the conviction underlying this case is between 3 and 11 years, and the mandatory, consecutive, sentence for the gun specification is 3 years. *See* R.C. 2929.14(A)(1)(b); R.C. 2941.145(A); R.C. 2929.14(B)(1)(a)(ii); R.C. 2929.14(C). Thus, we find that the term of incarceration imposed in this case falls within the statutorily permissible range. The record also shows that the trial court properly applied postrelease control. Finally, the trial court expressly stated that it considered the purposes and principles of sentencing in R.C. 2929.11, and considered the sentencing factors listed in R.C. 2929.12. That the trial court specifically mentioned and discussed two of the three overriding purposes of felony sentencing—namely, punishment and protection of the

20.

public—is reasonable, given the horrific nature of the crime and the injuries sustained by the victim. In no way does the court's mention of those two purposes signify or otherwise imply a lack of consideration of the third. Based on the foregoing, we find that appellant's sentence was not clearly and convincingly contrary to law. Therefore, appellant's second assignment of error is found not well-taken.

{¶ 39} We affirm the judgments of the Fulton County Court of Common Pleas. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgments affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.
_____
JUDGE
Christine E. Mayle, J.

Gene A. Zmuda, P.J.               _____
CONCUR.                                        JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.