[Cite as *State v. Overton*, 2025-Ohio-5606.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

| | |
|---|---|
| State of Ohio | Court of Appeals No. {48}L-24-1209 |
| Appellee | Trial Court No. CR0202002694 |
| v. | |
| Andre Overton | **DECISION AND JUDGMENT** |
| Appellant | Decided: December 16, 2025 |

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Brenda J. Majdalani, Assistant Prosecuting Attorney, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal from a judgment by the Lucas County Court of Common Pleas which, following finding appellant Andre Overton competent to stand trial and his no-contest plea offer, found him guilty of murder with a firearm specification and sentenced him to an aggregate prison term of 18 years to life. For the reasons set forth below, this court affirms the trial court's judgment.

**{¶ 2}** Appellant sets forth two assignments of error:

1. The trial court erred when it overruled appellant's motion to suppress statements.
2. The trial court erred when it found no violation of R.C. 2945.39, when appellant had been held in pretrial detention awaiting trial for more than one year.

## I. Background

**{¶ 3}** At the time of the murder, the 21-year-old appellant lived with his father and sister, J.O., at the father's home in Toledo, Lucas County, Ohio. During the evening of Saturday, December 19, 2020, while two girlfriends, D.S. and S.B., were visiting with J.O. in her bedroom, appellant entered the bedroom without warning and shot D.S. in the head three times. He then pointed the gun at S.B., denied out loud that he had just shot D.S., and fled the bedroom. Appellant later told police and medical personnel that he thought D.S. was possessed and was in a conspiracy, with unidentified others, to kill him.

**{¶ 4}** After the shooting S.B observed appellant in the hallway use a towel to wipe the blood off the gun and place the gun in his pocket. An in-house surveillance video, on which off-camera gunshots were heard, also captured appellant put a firearm into his pocket before proceeding out the back door. In addition, the surveillance video captured appellant walking down the stairs and towards the kitchen's back door and announcing aloud that he just shot D.S.

**{¶ 5}** Later, Toledo police responded to a shots-fired dispatch at the father's home. The police found D.S. deceased in an upstairs bedroom on the bed with three gunshot wounds to the head. No one else was in the home. The coroner's autopsy report ruled the

2.

cause of D.S.'s death was three gunshots to the head and the manner of death was homicide.

{¶ 6} Meanwhile, appellant fled his father's house and over the course of the rest of December 19 and into December 20, he disposed of the murder weapon, stole a car, crashed and abandoned it, and then stole another car, which he also eventually crashed, as he drove around deciding where to go to get away. Appellant was able to pinpoint the exact location on a map for the Toledo police to find the murder weapon. However, the gun was not found. He headed into Michigan towards the Detroit airport. Appellant later told investigators and mental health personnel that he had a promising basketball career and believed he could continue it in Dallas, Texas playing for The Mavericks team.

{¶ 7} At some point appellant decided to return to Toledo. The Ohio State Highway Patrol stopped appellant and took him into custody. Appellant was brought to the downtown Toledo police station for questioning about the shooting of D.S. at around 1:30 pm on December 20, 2020. The entire interview was recorded on video with audio and is in the record. At the station appellant waived his Miranda rights in writing and was questioned by two police detectives. Appellant was slowly and clearly walked through each of his rights and given the opportunity to state if he did not understand what he waived. He did so calmly and clearly. Appellant admitted to police that he shot D.S., that he stole the cars because he was trying to get away and get to Dallas, and that he disposed of the gun and told police where to find it.

3.

{¶ 8} The interrogating officers, Toledo police detectives Sharp and Mooney, testified in the record. They described appellant as polite, respectful, intelligent, well-spoken, lucid, and coherent when answering their questions. Each testified that they would not proceed to interview appellant if he could not understand the questions or was having a break from reality. According to Detective Sharp, "I mean, he responded to all of our questions. Sometimes he did think about some of his answers, but he responded to all of our questions." According to Detective Mooney, at no time was appellant unresponsive to questions or appear to be "not fully there" mentally: "I think he's very lucid. I think he's coherent. He understands everything we say to him. He gives very good answers as far as what we know to be truthful, what we know to be facts." During the police interview appellant was asked about his mental state and he replied that "Right now I'm cool." Soon after admitting to shooting D.S., appellant then raised the possibility of his mental instability and appeared to be more upset. At no point during appellant's interrogation did either detective feel that appellant did not understand what they were asking. At the conclusion of the questioning, appellant was arrested for shooting D.S.

{¶ 9} Appellant was indicted by a Lucas County Grand Jury on December 29, 2020, on five counts as follows: Count No. one: aggravated murder in violation of R.C. 2903.01(A) and an unclassified felony under R.C. 2903.01(G), with a firearm specification in violation of R.C. 2941.145(A),(B),(C), and (F); Count No. two: murder in violation of R.C. 2903.02(B) and an unclassified felony under R.C. 2929.02, with a firearm specification in violation of R.C. 2941.145(A),(B),(C), and (F), while committing felonious assault; Count No. three: felonious assault in violation of R.C. 2903.11(A)(2)

4.

and a second-degree felony under R.C. 2903.11(D), with a firearm specification in violation of R.C. 2941.145(A),(B),(C), and (F); Count No. four: grand theft of a motor vehicle in violation of R.C. 2913.02(A)(1) and a fourth-degree felony under R.C. 2913.02(B)(5); and Count no. five: one count of tampering with evidence in violation of R.C. 2921.12(A)(1) and a third-degree felony under R.C. 2921.12(B).

{¶ 10} Within two weeks, and before appellant could be arraigned, appellant requested an R.C. 2945.37 competency-to-stand-trial evaluation, which the trial court granted on January 14, 2021. After appellant raised the issue of his competence to stand trial, the record shows the trial court immediately scheduled a competency hearing under R.C. 2945.37(B). Appellant is presumed competent to stand trial unless, after a hearing, the trial court "finds by a preponderance of the evidence that, because of the defendant's present mental condition, the defendant is incapable of understanding the nature and objective of the proceedings against the defendant or of assisting in the defendant's defense[.]" R.C. 2945.37(G). "'[T]he burden is on the defendant to prove by a preponderance of the evidence that he is not competent.'" *State v. Stutzman*, 2019-Ohio-1695, ¶ 12 (9th Dist.), quoting *State v. Were*, 2008-Ohio-2762, ¶ 45.

{¶ 11} Prior to his arraignment on February 10, 2022, appellant was evaluated three times for competency and the trial court held three hearings.[1] Importantly, on April

---

[1] The transcript of the March 3, 2021 hearing and Dr. Forgac's February 8, 2021 report discussed at that hearing are not in the record before us. The transcript of the April 28, 2021 hearing is not in the record before us, but Dr. Babula's April 11, 2021 report discussed at that hearing is. The transcript of the February 10, 2022 hearing and the January 10, 2022 NOPH report by Skinner are not in the record before us. It is well-

5.

28, 2021, the trial court stated, under R.C. 2945.37 and 2945.38(C), that although appellant was incompetent to stand trial according to the February 8 and April 11 medical reports, there was "a substantial probability" he was capable of being restored to competency within one year "if provided with a course of treatment" at the Northwest Ohio Psychiatric Hospital ("NOPH"). On February 10, 2022, the trial court stated that under R.C. 2945.38(H), appellant was restored and competent to stand trial according to the January 10 medical report.[2] He was arraigned and entered not guilty pleas to all charges.

{¶ 12} Then on March 24, 2022, appellant changed his plea in writing, as required by Crim.R. 11(A) and R.C. 2943.04, to not guilty by reason of insanity ("NGRI"). As with competency, a defendant is presumed to be sane and has the burden of proof to challenge that presumption. *State v. Davis*, 2021-Ohio-237, ¶ 118 (11th Dist.). "An NGRI defense is merely an affirmative defense, not required under the United States Constitution." *State v. Arnold*, 2025-Ohio-2547, ¶ 26 (6th Dist.). To prove the defense, appellant must demonstrate "that at the time of the commission of the offense, the defendant did not know, as a result of a severe mental disease or defect, the wrongfulness of defendant's acts." R.C. 2901.01(A)(14).

---

settled that where appellant did not include a transcript of a hearing, we must assume the regularity of that hearing. *State v. Grimes*, 2017-Ohio-2927, ¶ 20.

[2] Appellant refused treatment between August 23 and September 17, 2021, when the trial court authorized NOPH to force appellant to receive antipsychotic mediations. His symptoms then improved dramatically.

6.

{¶ 13} At this point appellant was still considered competent to stand trial, which did not automatically change with his NGRI plea:

> In Ohio, both competency and a plea of NGRI are governed by statute, R.C. 2945.37 through 2945.402. . . . The evaluations conducted for each, furthermore, assess different matters; competency determinations require an evaluation of "the defendant's present mental condition" and a plea of NGRI requires evaluation of "the defendant's mental condition at the time of the offense charged." R.C. 2945.371(A). . . . [A] finding of incompetence for purposes of standing trial does not equate to a finding of NGRI or preclude indictment, considering the separate law applicable to each finding. Upon indictment and indicia of incompetence, Ohio law requires evaluations of mental condition and treatment for the purpose of restoring competency, including forced medication, treatment, and even commitment. *See* R.C. 2945.37-2945.39. An NGRI finding, however, begins with assertion of NGRI by written plea, and requires an evaluation of a person's capacity at the time of the offense, with procedure after conviction governed by statute. *See* Crim.R. 11(A) and (H); R.C. 2945.37-2945.371, R.C. 2945.40-2945.401. . . . Therefore, NGRI is a defense that does not prevent the state from charging a person for criminal conduct, even if that person suffers from a mental illness.

*Arnold* at ¶ 27, 29.

{¶ 14} Appellant's NGRI plea led to a criminal responsibility evaluation, also called a sanity evaluation, and on April 14, 2022, the trial court referred the matter to the Court Diagnostic and Treatment Center under R.C. 2945.371(G)(4). Prior to filing a subsequent motion to suppress all of his December 20, 2020 incriminating statements made to Toledo police, appellant was evaluated two times for criminal responsibility, and

7.

the trial court held one hearing at which the trial court stated that per the medical reports appellant failed to meet his burden under R.C. 2901.01(A)(14)[3] for an NGRI plea.[4]

{¶ 15} Before the second criminal responsibility hearing was set, on September 29, 2022, appellant requested another R.C. 2945.37 competency-to-stand-trial evaluation, which the trial court granted that day. Appellant was ordered to NOPH for up to 20 days for an R.C. 2945.371(D)(2) evaluation. Dr. Sirkin submitted his report on November 15, that appellant was restored to competency and specified the medication levels he is to receive while in jail. On November 22, the trial court ordered the jail to follow Dr. Sirkin's instructions for appellant's medications.[5] At this point appellant was still considered competent to stand trial.

---

[3] R.C. 2901.01(A)(14) in effect at that time stated, "A person is 'not guilty by reason of insanity' relative to a charge of an offense only if the person proves, in the manner specified in [R.C. 2901.05], that at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts."

[4] The July 7, 2022 hearing transcript is in the record, but not Dr. Forgac's July 6 report discussed at that hearing, where he concluded that appellant understood his criminal responsibility. At appellant's request and selection, the trial court then referred the matter for a second criminal responsibility evaluation by Dr. Stinson, who did not submit a report. Ultimately on April 26, 2023, Dr. Babula submitted the second criminal responsibility evaluation under R.C. 2945.371(H)(4), which is in the record. Dr. Babula concluded that at the time of the offense charged, appellant "did know the wrongfulness of the acts charged. . . . All of these suggest that, despite some impairment in thinking, he retained the ability to recognize the wrongfulness of the acts charged." On August 22, 2023, the trial court affirmed Dr. Babula's conclusion that appellant failed to meet his burden under R.C. 2901.01 for an NGRI plea.

[5] The November 22, 2022 hearing transcript is in the record, but not Dr. Sirkin's report discussed at the hearing. The trial court reviewed the chronology of appellant's competency evaluations and the necessity of 20 mg of an antipsychotic medication, which the jail unilaterally decreased to 5 mg before NOPH restored him to competency.

8.

{¶ 16} Then on June 13, 2023, appellant moved to suppress all of his statements made to the Toledo police on December 20, 2020. Appellant did not seek to suppress the in-house surveillance video in which he announced he had just shot D.S. as he walked down the stairs. Rather, appellant argued that although he voluntarily waived his Miranda rights before speaking with the police and incriminating himself, he did not do so knowingly and intelligently in violation of his constitutional rights. The trial court held the suppression hearing on August 17, 2023. Dr. Babula, who produced reports dated April 11, 2021 and April 26, 2023, testified for appellant, and Toledo police detectives Sharp and Mooney testified for appellee.

{¶ 17} Dr. Babula testified to originally diagnosing appellant with schizophrenia and opined that condition could affect appellant's ability to appreciate the consequences of waiving his Miranda rights. Dr. Babula further testified that appellant had difficulty recalling things later, which might impact his ability to reassert his Miranda rights during the police interview after having waived them. When asked if he formed an opinion of whether appellant could process or understand new concepts, such as his constitutional rights, Dr. Babula testified: "So I have an opinion based on the information that was available that he will struggle, so it is not essentially a black or white that he can or cannot, but there are struggles that are present." When asked if he had an opinion of whether appellant could knowingly and intelligently waive his Miranda rights, Dr. Babula testified, "I don't have a definite conclusion on his specific ability to waive his Miranda rights." Finally, when asked if his opinion changed between his first and second

9.

reports such that, despite some impairment in thinking, appellant retained the ability to recognize the wrongfulness of the acts charged, Dr. Babula answered, "No."

{¶ 18} On August 22, 2023, the trial court denied appellant's motion to suppress. Specifically, the trial court described the Miranda-rights process as follows:

> When Detective Sharp went through the rights he told Mr. Overton that he could ask any questions. He also asked him to speak out loud since it was being recorded. He then read each line and after each he asked if he understood. The Defendant did state he had never been read his rights and was not familiar with them through television. He did hesitate after the last line on the rights form. When that happened the Detective asked again if he understood, which Defendant answered in the affirmative. He was then asked if he was willing to talk about the night before and he said yes and said he accidentally shot a girl.

{¶ 19} The trial court concluded its review of the testimony and of the evidence, particularly the interrogation video:

> Generally the Court viewed his answers as clear and concise. The Court appreciated the testimony of Dr. Babula, however, the Court found that the doctor's testimony did not overcome what the Court could see with its own two eyes in the recording. All of Dr. Babula's answers concerning the Defendant's awareness as to the nature of his rights and the consequences of waiver had qualifiers before them: COULD, WOULD, and MIGHT. He ultimately gave no opinion. The doctor admitted that he could not say that Andre Overton did not knowingly and intelligently waive his rights, only that he had significant questions.
> The Court did not see what Dr. Babula pointed out as evidence of those significant questions. The Court finds that the State presented evidence that proves by a preponderance of the evidence that Mr. Overton did knowingly and intelligently waive his rights. That evidence outweighs the doctor's questions as to what might have been. Therefore, the Court finds the Defendant's motion not well taken and denies the same. (Emphasis sic.)

10.

**{¶ 20}** By November 6, 2023, appellant filed another motion for competency-to-stand-trial evaluation and hearing, which the trial court granted the same day. The trial court ordered appellant to NOPH for an R.C. 2945.37 evaluation.[6]

**{¶ 21}** Appellant and NOPH requested, and the trial court granted, multiple continuances to the desired competency hearing, which was finally scheduled for May 1, 2024.[7]

**{¶ 22}** Dr. Sirkin testified for appellee that he had been familiar with appellant's condition since the first court referral to NOPH in 2021. He explained the important role the right medication was to appellant's restored competency. Without the correct medication regimen while in jail, appellant's competency can falter.

> His symptoms are certainly worse [when he is] off medication and that's always been the point where there's been questions about his competency to stand trial. . . . He needs treatment for his mental illness before he is at the point where he can be deemed competent. . . . [But] people's conditions vary over time. I mean, as it is with this admission, his current treatment team felt that he needed more medications and higher doses than he had taken during the previous admission. So I don't want to say 100 percent that, you know, people with schizophrenia find the right medication and never need a medication adjustment ever again, because he could need medication adjustment in the future. But a competency evaluation being a here-and-now evaluation of, as I'm evaluating him, can he do these things, my opinion was that, yes, he had the capacity to do the things he needed to do per statute.

---

[6] Appellant refused treatment between December 7, 2023, and January 4, 2024, when the trial court authorized NOPH to force appellant to receive antipsychotic mediations. Once again, his symptoms then improved dramatically.

[7] The May 1, 2024 hearing transcript is in the record as well as Dr. Sirkin's April 2, 2024 report on appellant's competency to stand trial, not sanity for the NGRI defense, as supplemented on April 15, and Dr. Tilly's report discussed at that hearing.

11.

{¶ 23} Dr. Sirkin explained the difference between competency and sanity evaluations. A competency evaluation, which the trial court ordered from him, is a here-and-now evaluation where, "Sitting in front of me today, do you understand what you're charged with, do you understand, you know, the basics of your legal options, not looking for someone to be their attorney, they understand the legal situation well enough to work with their attorney, assist in their own defense." A sanity evaluation, which the trial court did not order from him, "puts the focus on retrospective evaluation of their mental illness. . . focused more on the day of the offense, what he was thinking, feeling on the day of."

{¶ 24} Dr. Sirkin testified appellant understood and "was able to repeat back the difference." He concluded: "So in putting together Mr. Overton's best recollections with contemporaneous records, which is what an evaluator would do as part of putting together a sanity opinion, it was my opinion that Mr. Overton could adequately participate in a sanity evaluation. Therefore, that just supplemented my opinion that Mr. Overton is currently competent."

{¶ 25} Dr. Sirkin further explained why appellant was capable of assisting in his defense:

> I asked him what the different pleas were, he was able to name all four off the top of his head; not guilty, guilty, no contest and NGRI. . . [M]y understanding was . . . the focus was going to be on a mental health defense in his case, so I spent a little extra time on making sure that he understood what an NGRI plea is . . . and he answered that an NGRI plea essentially means you did it but you weren't in the right state of mind, and understood the consequences of a successful NGRI plea, that it wasn't that you immediately were out in the community, that the majority of people with a successful NGRI plea can then get sent back to the hospital and, again, in his case, based on his charges, he described this being sentenced to the hospital for life. So he demonstrated understanding of a plea

12.

including a mental health plea like NGRI. . . . It remained my opinion [after the supplemental evaluation] that Mr. Overton had the capacity to understand the nature and objectives of the proceeding against him and had the capacity to assist in his own defense should he choose to.

{¶ 26} Dr. Sirkin explained why appellant did not need to be symptom-free in order to be found competent:

It's important to see what symptoms are left, whether or not the specific symptoms are enough to derail the, you know, nature and objectives, to derail the working through defense.

And, as I already alluded to earlier, you know, Mr. Overton was not completely symptom-free, but he certainly did a good job. I believe Dr. Tilley, in his report, agreed that Mr. Overton did fine with the knowledge of, you know, nature and objectives. The question came down to some degree of insight, being able to talk about his mental illness, and, again, from my perspective and my opinion, based on, you know, doing this [thousands] of times for 20-plus years, is that Mr. Overton was able to demonstrate to me that he did accept that he has a mental illness, that he recognized that his mental illness affected his thinking on the date of the offense, and had adequate insight to how that related to the legal process; that he was on board with working with his attorney on the mental health defense should that be the . . . direction that they choose to go with it.

{¶ 27} Dr. Tilly testified for appellant that appellant is not competent to stand trial because he cannot assist in his defense: "My opinion is that he is mentally ill. In fact, he is symptomatic with a serious mental illness, specifically schizophrenia. . . . And my opinion is that he is capable of understanding the nature and objective of the proceedings. . . . And my opinion is that he is presently incapable of assisting in his defense." The reason appellant is incapable of assisting in his defense is because of his "delusional behaviors about [his version of] the events in question and the alleged victim. . . the delusional beliefs that he evidenced which, in my opinion, would translate to him being

13.

incapable of factually or rationally consulting with [defense counsel] and co-counsel in the case."

{¶ 28} Dr. Tilly concluded that he could not opine on appellant's sanity after all: "[I]t's my opinion that because of the concerns about his competency, I'm unable to proceed with conducting a thorough and complete evaluation of [sanity] . . . [because] it's considered best practice in my field to generally hold off on conducting a complete evaluation of a defendant's sanity if there are concerns about the defendant's competency to proceed."

{¶ 29} On May 21, 2024, the trial court agreed with Dr. Sirkin's April 2 report that appellant was competent to stand trial.

{¶ 30} Meanwhile on April 18, 2024, appellant filed a motion to proceed under R.C. 2945.39, which appellee opposed, arguing that he had not been restored to competency within the one-year period stated in R.C. 2945.38(C)(1)(a), which states:

> No defendant shall be required to undergo treatment, including any continuing evaluation and treatment, under [R.C. 2945.38(B)(1)] for longer than . . . One year, if the most serious offense with which the defendant is charged is . . . Aggravated murder, murder, or an offense of violence for which a sentence of death or life imprisonment may be imposed.

{¶ 31} Appellant argued, "As of the date of this motion, Mr. Overton remains incompetent to stand trial," and the prosecution of him must terminate on May 1. Appellant argued, "Unless there is a judgment entry finding restoration, Mr. Overton has not been restored to competency to stand trial" because a court only speaks through its judgment entries. Using that premise of judgment entries, appellant argues that 309 days ran between April 28, 2021, when the trial court ordered appellant to NOPH at 14.

appellant's request, and February 10, 2022, when the trial court issued a judgment entry that appellant was restored to competency. Then 55 days ran between September 29, 2022, when the trial court ordered appellant to NOPH at appellant's request, and November 22, 2022, when the trial court issued a judgment entry that appellant was restored to competency. Then 123 days ran between November 6, 2023, when the trial court ordered appellant to NOPH at appellant's request, and March 7, 2024.[8] By appellant's calculation, a total of 487 days ran, which exceeds the one-year statutory limit. "Despite all of the well intended effort, it is time to acknowledge that Andre is mentally ill, not restorable, and that the statutory time to restore him to competency has run."

{¶ 32} On May 15, 2024, the trial court denied appellant's motion by agreeing with appellee that the one-year calculation is for a treatment year, not a calendar year. As the trial court stated, "The Court finds that [R.C. 2945.38(C)(1)(a)] really could not be any clearer. A defendant may not undergo evaluation and treatment for longer than one year. If it would have meant for all the time to count while treatment was not happening, the authors could have easily stated such." Citing *Cleveland v. Allen*, 2009-Ohio-860 (8th Dist.) and *State v. Barker*, 2007-Ohio-4612 (2d Dist.), the trial court proceeded with the following calculation under R.C. 2945.38(C)(1)(a):

---

[8] Despite appellant's argument that the trial court only spoke through judgment entries, he does not identify what the court decided and allegedly journalized on March 7, 2024. We find there is no entry for March 7. Rather, "[p]ursuant to the request of the Court," on March 5, the trial court vacated the March 7 hearing and rescheduled it for April 4.

15.

{¶ 33} First, the period between August 20, 2021, when appellant's treatment at NOPH actually began at his request, and January 10, 2022, when NOPH reported that appellant was restored to competency. "The Court is not saying that is the date he was automatically restored. It is however the date when restoration treatment was completed. During that time the Court calculates that Mr. Overton underwent treatment for 144 days."

{¶ 34} Second, the period between November 4, 2022, when treatment at NOPH restarted at his request after the jail unilaterally lowered appellant's medication dosage without his treating physician's consent, and November 16, 2022, when NOPH reported that appellant was restored to competency through the correct medication dosage. "Although there may be an argument that there was no real treatment at that time except to put his medication back in order, the Court finds 12 more days ran against the one year."

{¶ 35} Finally, the period between December 7, 2023, when appellant's treatment at NOPH actually restarted at his request and after a bed was available, and April 3, 2024, when NOPH reported that appellant was restored to competency through the correct medication adjustments. "The Court calculates that the Defendant received 118 days during treatment."

16.

{¶ 36} The trial court concluded:

> The Court calculates a total 274 days of treatment leaving 91 days left in the one year time frame allotted by statute. The Court has not even calculated the days when Mr. Overton was refusing to take his medications that were vital to his treatment. The Court will note that relevant case law supports that time should not run when medication is being refused. For these reasons the Court finds the Defendant's motion not well taken and denies the same.

{¶ 37} After additional pretrial events that included appellant's change of appointed counsel, on August 15, 2024, appellant offered a plea resolution, verbally and in writing, of no contest to count No. two, murder with a firearm specification. The trial court conducted an extensive plea colloquy before accepting appellant's no-contest plea and finding him guilty of same. In exchange, appellee agreed to dismiss at sentencing the remaining counts and attached firearm specifications.

{¶ 38} The matter immediately proceeded to sentencing. Appellant preserved for appeal the trial court's May 15, 2024 judgment entry denying appellant's motion to proceed under R.C. 2945.39. The trial court then sentenced appellant to a prison term of 15 years to life for murder plus a mandatory three years for the firearm specification, for an aggregate prison term of 18 years to life.

{¶ 39} Appellant timely appealed.

## II. Motion to Suppress

{¶ 40} For his first assignment of error, appellant does not challenge the knowing-, voluntary-, and intelligent-prongs of his actual no-contest plea for murder-with-a-firearm-specification and sentencing. Nor does appellant challenge the voluntary prong of waving his Miranda rights on December 20, 2020, when he admitted to killing D.S., among other

17.

crimes. Rather, he challenges the knowing- and intelligent-prongs of waving his Miranda rights prior to the Toledo police interrogation due to his mental illness, alleging incompetency under R.C. 2945.37 and alleging insanity for his failed NGRI defense under R.C. 2901.01(A)(14) and 2945.371(G)(4). Since the knowing prong is not in dispute, appellee has the burden to show by a preponderance of the evidence that appellant made a voluntary and intelligent waiver of his Miranda rights. *State v. Penn*, 2021-Ohio-1761, ¶ 26 (6th Dist.), citing *State v. Reynolds*, 2017-Ohio-1478, ¶ 64 (6th Dist.).

{¶ 41} A no-contest plea is not an admission of guilt, but an admission of the truth of the facts alleged in the indictment. Crim.R. 11(B)(2). Nevertheless, "the plea of no contest does not preclude a defendant from asserting upon appeal that the trial court prejudicially erred in ruling on a pretrial motion, including a pretrial motion to suppress evidence." Crim.R. 12(I). Although appellant summarily argues that the trial court's denial of his motion to suppress prejudiced him, prejudice is not automatic. *State v. Urbanski*, 2023-Ohio-3966, ¶ 21 (6th Dist.), citing *State v. LaRosa*, 2021-Ohio-4060, ¶ 50. For example, even if appellant's incriminating statements during his police interview were suppressed, there is the eyewitness testimony of S.B. and the incriminating statement appellant made on the in-home surveillance video while walking down the stairs when he loudly announced that he just shot D.S.

{¶ 42} We review the trial court's denial of appellant's motion to suppress his own incriminating statements as a mixed question of fact and law. *LaRosa* at ¶ 17, citing *State v. Burnside*, 2003-Ohio-5372, ¶ 8. We accept the trial court's factual findings if they are

18.

supported by competent, credible evidence, but review de novo the trial court's legal conclusions. *Id.* The movant has the burden of proof. *State v. Williams*, 2022-Ohio-2439, ¶ 32 (6th Dist.). dehass

{¶ 43} This court has previously held, following a review of the totality of the circumstances in response to a nearly identical argument, "[W]e find that the police had no obligation to discontinue their interview of [the defendant] because he was mentally ill, and their failure to do so did not impact the voluntariness of the waiver of his *Miranda* rights or his subsequent confession." *Reynolds* at ¶ 75. The totality of the circumstances of appellant's Miranda waiver includes appellant's age, mentality, prior criminal experience, length, intensity and frequency of interrogation, existence of physical deprivation or mistreatment and existence of threat or inducement by which is revealed both an uncoerced choice and the requisite level of comprehension. *Id.* at ¶ 65. Stated otherwise, the voluntariness of appellant's Miranda waiver and his resulting incriminating statements depends on the absence of police overreaching, not on appellant's "free choice" in any broader sense. *Penn*, 2021-Ohio-1761, at ¶ 28 (6th Dist.), citing *Reynolds* at ¶ 68. Although this was appellant's first murder incident and his first time being Mirandized, the video evidence of the police interrogation was calm, polite, and completely lacking in coercion or police overreach. Appellant was not handcuffed and was made comfortable under the circumstances. He had ample opportunity to state whether he did not understand each right he verbally waived and waived in writing by initialing each right and finally signing the waiver form. *See id.* at ¶ 29-30; *Reynolds* at ¶ 66.

**{¶ 44}** We find the trial court's factual findings are supported by competent, credible evidence, and accept them. The trial court saw "with its own two eyes" the recording of appellant's Miranda waiver on December 20, 2020. Not only did Dr. Babula "ultimately [give] no opinion," but he also "admitted that he could not say that Andre Overton did not knowingly and intelligently waive his rights, only that he had significant questions."

**{¶ 45}** Having found there is competent, credible evidence to support the trial court's factual findings, upon de novo review, we further find no error with the trial court's decision to deny appellant's motion to suppress because it is undisputed that, despite Dr. Babula's inability to offer a clear opinion, he could affirm that appellant retained the ability to recognize the wrongfulness of the acts charged. "A defendant is presumed competent as a matter of law, R.C. 2945.37(G), and cannot hope to overcome that presumption with evidence that he merely suffers from mental instability, requires psychotropic medication, or refuses to cooperate with his counsel." *Stutzman*, 2019-Ohio-1695, at ¶ 16 (9th Dist.).

**{¶ 46}** Appellant's first assignment of error is not well-taken.

### III. Motion to Proceed Under R.C. 2945.39

**{¶ 47}** The legal support for appellant's second assignment of error is to merely call as dictum the Eighth District Court of Appeals statement that nothing in R.C. 2945.38(C) suggests that the one-year period begins to run on the date the trial court ordered treatment. *Cleveland* at ¶ 14 (8th Dist). We disagree with appellant because the clear, unambiguous language of the statute is material to the Eighth District's opinion.
20.

*State ex rel. Gordon v. Barthalow*, 150 Ohio St. 499, 505–06 (1948) (dictum is any incidental remark, reflection, comment, or the like by a judge that is not material to the decision or judgment).

{¶ 48} Before the trial court could decide on appellant's motion to proceed under R.C. 2945.39, appellant had the burden to show by a preponderance of the evidence that he was not restored to competency within the maximum one-year period allowed by R.C. 2945.38(C)(1)(a) and 2945.38(H)(3). Appellant failed to do so.

{¶ 49} Appellant creatively argues that we should interpret R.C. 2945.38(C)(1)(a) as requiring the one-year time calculation according to the trial court's journalized entries, not appellant's actual days of undergoing treatment. We decline to accept appellant's argument because the phrase "undergo treatment" in the statute is not ambiguous. *State v. Edwards*, 2018-Ohio-1739, ¶ 18 (6th Dist.) ("When interpreting a statute, a court must presume that the legislature meant exactly what it said and cannot delete or add words."). We find that to "undergo treatment" reflects receiving treatment, including any continuing evaluation and treatment, and not periods of thinking about receiving treatment while waiting for a treatment bed to become available, or not receiving treatment because the defendant refused treatment. *See State v. Barker*, 2007-Ohio-4612, ¶ 11 (2d Dist.). We agree with the Eighth District Court of Appeals that nothing in R.C. 2945.38(C) suggests that the one-year period begins to run on the date the trial court ordered treatment. *Cleveland* at ¶ 14; *State v. Swanigan*, 2025-Ohio-4648, ¶ 26 (1st Dist.) (the "maximum-treatment period is measured against the total time the

21.

defendant has been committed for restoration treatment during a criminal proceeding");
*see State v. Williams*, 2010-Ohio-2453, ¶ 11-12.

**{¶ 50}** Upon review we find that appellant failed his burden to show by a preponderance of the evidence that he was not restored to competency within the maximum one-year period allowed by R.C. 2945.38(C)(1)(a) and 2945.38(H)(3). We find no trial court error when it denied appellant's motion to proceed under R.C. 2945.39.

**{¶ 51}** Appellant's second assignment of error is not well-taken.

## IV.  Conclusion

**{¶ 52}** On consideration whereof, the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

Gene A. Zmuda, J.                              _____
                                                              JUDGE

Charles E. Sulek, P.J.                       _____
CONCUR.                                                   JUDGE

                                                   _____
                                                              JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.